NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

SHURTENDA STEAKS, INC., Respondent.

No. 9692.

United States Court of Appeals Tenth Circuit.

July 5, 1968.

Charles N. Steele, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael N. Sohn and Edith Nash, Attys., N.L.R.B., on the brief), for petitioner.

Harold B. Wagner, Denver, Colo. (Dean Vanatta, Denver, Colo., on the brief), for respondent.

Before PHILLIPS, HILL and HICKEY, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

This case is before the court on a petition of the National Labor Relations Board[1] to enforce its order against Shurtenda Steaks, Inc.[2]

The Board adopted the findings, conclusions, and recommendations of its Trial Examiner.

The questions presented are whether the Board's finding that the employer refused to bargain in good faith with its employees in violation of § 8(a) (5) of the National Labor Relations Act, as amended,[3] (29 U.S.C.A. § 151 et seq.) and its finding that the employer interfered with, restrained, and coerced its employees in violation of § 8(a) (1) of the Act are supported by substantial evidence on the record considered as a whole.[4]

We have carefully examined the entire record and are convinced that the findings of the Board are supported by substantial evidence on the record considered as a whole.

The evidence, together with admissions shown by the record to have been made by the employer, manifests the following facts:

At all times here material, the employer was engaged at Denver, Colorado, in the business of processing, selling and distributing prepackaged steaks or steak patties to supermarkets and frozen food distributors; and it sold and distributed annually in Denver, Colorado, products in excess of $50,000 in value, which were shipped directly to states other than Colorado, and was engaged in commerce within the meaning of § 2(6) and (7) of the Act. No issue as to jurisdiction is presented.

At a Board-conducted election held on December 29, 1964, a majority of the employees of the employer, in an appropriate unit, designated the Amalgamated Meat Cutters and Butcher Workmen of North America, Local Union No. 634, AFL-CIO[5] as the exclusive representative of the employees in the unit for the purposes of collective bargaining. On January 7, 1965, the Regional Director certified the Union as the exclusive bargaining representative of such employees. The unit embraces all production and maintenance employees of the employer, including truck drivers employed by it at its Denver, Colorado plant, but excluding all clerical employees, salesmen, driver salesmen, guards, professional employees, and su-

1. Hereinafter called the Board.

2. Hereinafter called the employer or Shurtenda.

3. Hereinafter called the Act.

4. 29 U.S.C.A. § 160(f).

5. Hereinafter called the Union.

pervisors. The election, the appropriativeness of the unit and the certification are not here challenged by the employer.

On January 15, 1965, G. W. Dean, secretary-treasurer of the Union, wrote David J. Barnes, the employer's vice president, notifying him of the Union's certification as the bargaining agent of such employees and requesting a meeting on January 20, 1965. Harold B. Wagner, the employer's attorney, appeared at the Union office on such date.[6] He stated that Mr. Boone, president of the employer, had "very violent objections to a Union," and that he (Wagner) did not want to discuss a collective bargaining agreement; that if the Union would withdraw charges it had filed of discriminatory layoffs by the employer, it would put him (Wagner) in a better position to discuss the matter with Boone and Barnes. The Union agreed to withdraw and shortly thereafter did withdraw the charges. At such meeting, Wagner stated that Boone and Barnes had not theretofore dealt with a Union and asked them to give him something to show them in the way of a contract. The Union representatives gave Wagner a copy of a collective bargaining agreement they had entered into with Tad's Steaks, Inc., as representative of the type of contract they wanted for Shurtenda's employees. Wagner stated that the employer did not intend to stay in business.

On January 25, 1965, the employer entered into a contract with the Walkling Corporation of Denver, Colorado, whereby the latter agreed to process steaks for Shurtenda, under the Shurtenda name and formula.

Following the execution of the contract with Walkling, the employer sent some of its production employees to Walkling to assist it in establishing the steak processing operation. The employer first began receiving production from Walkling in March 1965. The employer did not notify or consult with the Union in advance or afford it an opportunity to bargain respecting the subcontracting of a portion of its production to Walkling.

On January 28, 1965, Wagner mailed to the Union a proposed collective bargaining contract. It provided for current wages and omitted security and other provisions in the copy of the contract with Tad's Steaks, which the Union had given to Wagner on January 20, 1965. In a covering letter, Wagner stated the omitted provisions were not in the "joint interest of the company and the employees" and "if you doubt that this proposal is acceptable to the members of the bargaining unit, I suggest that you follow the standard practice of submitting it to these employees for their approval or disapproval."

Earlier that week the Union had filed an unfair labor charge against the employer, alleging that certain of its employees had been discriminatorily laid off. The covering letter referred to such charges and stated:

"When the complaint and notice of hearing in N.L.R.B. case No. 27–CA–1700 were dismissed last week, I assured my client that you were acting in good faith and that I was confident that you wanted to negotiate a contract in an atmosphere of cooperation free of pressure and animosity. It appears now that I was over-optimistic. The filing of new charges * * * justifies the company in concluding that the union has no desire to go forward with the consideration of a contract to be arrived at on the basis of the common interests and desires of the company and the employees but in an atmosphere of pressure and antagonism. These acts on the part of the union may not make agreement impossible, but they go a long way toward making it more difficult.

---

6. At all times here material, Wagner was acting as the agent of the employer and the employer adopted and ratified his action on its behalf; and the employer did not contend that Wagner was not authorized to represent or act for it, or that he exceeded his authority in any of the bargaining conferences.

"As previously explained to you, the principals in this company, Mr. G. L. Boone and Mr. David J. Barnes, are primarily salesmen. For some months they have been working on plans to decrease the company's meat processing activities with a view to terminating them altogether as soon as they can make the proper arrangements with processors located close to the markets.

"Please let me have your response to the company's proposal at your early convenience."

Shortly after receipt of the proposed contract and covering letter, George W. Green, a business representative of the Union, in a telephone conversation stated to Wagner that the proposed contract was unacceptable, that it did not give the employees more than they already had, and that they would not pay dues to get in writing something they already had. In reply, Wagner insisted that the proposed contract be submitted to the employees for approval or disapproval.

The next meeting was held on February 24, 1965, at the Federal Mediation Conference Room in Denver. Dean, Wagner, and Mediation Commissioner Nichols were present. Contract proposals in the area of Union maintenance and Union security were discussed, but little progress toward agreement was made. Dean accused Wagner of dilatory tactics and asked him if he had ever reached agreement on a bargaining contract in its entirety. Wagner replied it was none of Dean's "damn business" and that broke up the meeting. Thereafter, Union representatives endeavored to arrange another meeting, but were told Barnes and Boone were out of town.

On March 3, 1965, Wagner wrote the Union, enclosing a copy of the Colorado arbitration statute and suggested the pertinent language of the statute be substituted for arbitration provisions in the Union's contract form. Wagner also advised the Union that Boone and Barnes had returned and requested a conference in his office the following week, at which Boone and Barnes would be present. In his letter, Wagner also proposed the addition of two provisions to the contract which he had theretofore submitted to the Union. The first reserved the right to decrease production, move all or part of the employer's facilities, and to purchase all or part of its products from other processors; and also reserved the right to grant merit increases to employees based on "willingness, diligence, efficiency, and reliability."

On March 16, 1965, a meeting arranged for by the FMCS Commissioner was held at Wagner's office. Present were Dean and Green, representing the Union, and Barnes and Wagner, representing the employer. In the discussion at the meeting of the employer's January 28, 1965, proposed contract, Dean reiterated that it was unacceptable and did not warrant its submission to the employees, because he was confident they would refuse it. Barnes and Wagner disagreed and stated if the proposal was submitted to the employees they would accept it. Although Barnes said he would like to get the contract provisions settled, he repeatedly stated he could not make any binding commitments, since Boone had equal authority with him and his concurrence was necessary. At the meeting, Wagner stated he did not believe the Union any longer represented a majority of the employees, and proposed a meeting to be attended by the representatives of the employer and of the Union and by the employees. The Union representatives agreed.

The Mediation Commissioner made several unsuccessful attempts to arrange a joint meeting. Finally, a meeting time was agreed on, but was cancelled, because of the death of Wagner's brother and law partner.

In the latter part of May 1965, a Union meeting was held, at which the employees were present. A large majority of the employees voted to approve the Union's recommendation that the contract proposals of the employer be rejected, and the employees also voted for

the Union to continue negotiations in their behalf.

A few days later, due to an accumulation of inventory and processing of a part of its products by its subcontractor, and a limitation of 20,000 pounds of steaks per month in its license from the Department of Agriculture, the employer shut down its night shift operation and laid off six or seven of its employees. The employer's plant was overflowed from a flood in the Platte River on June 16, 1965, causing a shutdown. About three weeks later, operations were resumed. In the meantime, the employer had built up a backlog of orders and the employer recalled the employees on the night shift who had been laid off and most of them returned to work. The layoff was attributable in whole or in part to the accumulation of inventory and the processing by the subcontractor.

On June 1, 1965, the Union filed another unfair labor practice charge, alleging that the layoffs were discriminatorily motivated, in violation of § 8(a) (1) and (3) of the Act, and on June 7, 1965, the Union filed another unfair labor practice charge, alleging *inter alia* that the employer had refused to bargain collectively in violation of § 8(a) (5) of the Act. On July 14, 1965, the Regional Director issued a consolidated complaint based on those charges.

Thereafter, on September 22, 1965, the Regional Director approved a settlement agreement entered into between the parties.

The settlement agreement provided that the approval thereof by the Acting Regional Director should constitute withdrawal of the complaint and notice theretofore issued in the case. The agreement provided that the employer would make whole in specified amounts all employees who stated they did not desire and would decline reinstatement if offered to them; that the employer would post and comply with all the terms of the customary notice to employees attached to and incorporated in the agreement, which included a promise to bargain collectively with the Union as exclusive representative of the employees in the appropriate unit, to refrain from unilaterally subcontracting unit work, automating its productive process, or making any other changes affecting wages, hours, or terms and conditions of employment, without first notifying, offering to consult and bargaining with the Union, and to refrain in any manner from interfering with, restraining, or coercing its employees in the exercise of rights guaranteed under the Act.

On October 1, 1965, Green called Wagner and requested a meeting for the purpose of negotiating a collective bargaining agreement. Wagner reminded Green that the Union had consented to a joint meeting with the employees and declined to hold any further conferences until the Union proved it still represented a majority of the employees. Wagner suggested that a meeting for that purpose be held at the plant on Saturday, November 6, 1965. Green protested that the employer was obligated to bargain under the settlement agreement and insisted on a meeting for that purpose. Wagner remained silent. Later, in October 1965, Wagner, in a telephone conversation with Dean, whom he called, repeated his request for a meeting at the plant which all of the employees would attend. Dean protested, but Wagner insisted that the Union had promised to participate in such a meeting. Dean finally agreed and said he would have Green arrange the meeting.

The meeting was scheduled for November 6, 1965. Green went to the plant and notified the employees of the meeting. Rose Ortiz, one of three employees who had been laid off and later reinstated, testified that Green told her the purpose of the meeting was to negotiate a contract. He also asked the employees whether they wanted a Union meeting first and they decided it was unnecessary. The day before the scheduled meeting, Plant Manager Wofford notified the employees that the employer wanted them all to attend. About the

time of Green's visit to the plant, referred to above, Virginia Mares undertook a poll of the employees to determine their views regarding Union representation. On October 29, 1965, Mares, accompanied by the women on the shift, met with Barnes, Boone, and Wofford and reported to them that she had canvassed the women and determined that they no longer wished to be represented by the Union. Barnes expressed his gratification and assured the group that they would have no cause to regret their decision. Mares denied that she undertook the poll at Wofford's suggestion. She admitted that he might have called her into the office during October.

On November 6, 1965, the meeting took place in the employer's office. Present on behalf of management were Wagner, Barnes, and Plant Manager Wofford. The employer's foremen, Barr and Clancy, were also present. Dean and Green appeared for the Union. The employees present were foreladies Clara Arellano and Eva Pacheco and 11 others, including Mares, which constituted the employer's entire production complement, except for two employees who had not been notified of the meeting and one of whom was out of town. Union representative Green stated that the purpose of the meeting was to negotiate a contract and handed Wagner a copy of the Union's proposed contract. Wagner disagreed and stated, "We are here to determine if the majority still desire union representation." He refused to bargain "at this time," but professed a willingness to bargain at any other time. Green stated that the employer had agreed to bargain in the September 22 settlement agreement. Wagner responded, "I did not come here to discuss legalities." Green then began to discuss some of the details of the Union proposals, but employee Mares interrupted him and stated that the employees no longer wished to be represented by the Union. Green remarked that it was not surprising that the employees had "decided against us, since management does everything possible to discourage you by

lay-offs, threats to fire you, etc." Dean then stated, "we still represent you people and will continue to do so." After a further exchange of words between Dean and Wagner, the Union representatives left the meeting, after announcing that there would be a meeting at Union headquarters "to see if we strike this place" and "to see where we stand with you people." After the Union representatives had left, Wagner answered an employee's question on how the "union mess" began by stating that about a year before, by a "slim majority" the employees had designated the Union to represent them. When employee Mares asserted that "things are quite different now" and asked Wagner what the employees should do, he answered that management had no intention of telling them to attend or not to attend, but if "I had something on my mind, I would jump at the opportunity to express it."

Employer's foremen, Barr and Clancy, transported most of the employees to the Union meeting in employer-owned vehicles. The foremen also attempted to enter the Union headquarters, but were refused admittance.

The Union representatives began the meeting by asking if the employees wanted to strike, should the employer turn down the Union's last contract proposal. He also explained the monetary strike benefits available, if they went on strike, from Union funds. However, employee Mares asserted that the employees no longer wanted representation by the Union. She told the employees that the employer had said it could not grant any raises "as long as the Union is in the picture." The Union representatives asked the employees to decide the issue by secret ballot. After the vote was taken, Dean began to count the ballots. When he had examined a few and noted they were all "No" votes, he remarked that there was no point in continuing and left the remainder of the ballots uncounted. Union representative Green stated that the employer had coerced the employees into rejecting the Union, and that "we certainly aren't

going to let the company get away with it."

On November 15, 1965, Barnes wrote the Union that "pending further negotiations" the employer proposed to grant a 25-cent an hour increase, effective in pay checks to be issued on November 24, "unless there is some objection on your part." The Union replied that it remained willing to negotiate, but pointed out that the wage increase "is a purely unilateral increase and is not the result of collective bargaining." The Union further stated that it would have no objection to the pay increase, provided that the employer understood that the wage rates and other working conditions would ultimately be determined by collective bargaining.

On December 6, 1965, the employer wrote a letter to the Union, stating its position on various subjects of negotiation. While noting it had not suggested any specific period for the duration of the contract, it stated that "two years is much too long," because the Union had "lost the actual support of the employees many months ago"; that the overwhelming majority of the employees did not want the employer to enter into a contract of any kind, and that the anniversary of its certification with the N.L.R.B. was only a few weeks in the future. The employer also rejected the Union's proposal concerning overtime, on the ground that "the nature of the work is such that it is not feasible" to be bound to pay time and one-half for hours worked in excess of eight hours per day. The Union proposal for plant visitation rights for the Union's business agent

was also rejected, on the ground that it would only serve "as an irritant to management and workers," because the Union did not enjoy "friendly relations with either the management or the great majority of the employees." Other contract proposals were rejected and the employer omitted any proposals on grievances and arbitration, because it wanted to "discuss this further with our attorney before taking a position on it."

The Union acknowledged receipt of that letter and again requested face to face bargaining and asked the employer to advise the Union if it was now willing to sit down and bargain. The employer did not respond to that letter.

■ Evidence of unfair labor conduct of the employer which antedates a settlement agreement is admissible, not as a ground for remedial relief, but to aid the finder of the facts in determining the purpose and intent of the post-settlement conduct of the employer alleged in the charge and complaint to have constituted unfair labor practices.[7]

The Board so held, and in so doing applied in the labor relations field of the law principles of evidence well recognized in other fields of the law.[8]

■ The Union's certification on January 7, 1965, obligated the employer to bargain with it for at least one year from that date, irrespective of the Union's *de facto* majority status during such period.[9] And the settlement agreement executed by the parties and approved by the Acting Regional Director on September 22, 1965, obligated the employer to bargain with the Union for a

7. NLRB v. Northern California District Council of Hod Carriers, etc., 9 Cir., 389 F.2d 721, 724; See also: NLRB v. Richie Manufacturing Company, 8 Cir., —— NLRB ——, LRRM 2013, 2019; Local Lodge No. 1424, International Association of Machinists, AFL–CIO, et al. v. NLRB, 105 U.S.App.D.C. 102, 264 F.2d 575, 579, reversed on other grounds, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832.

8. FTC v. Cement Institute, 333 U.S. 683, 704, 68 S.Ct. 793, 92 L.Ed. 1010; United Mine Workers of America v. Pennington,

381 U.S. 657, 669, 85 S.Ct. 1585, 14 L.Ed. 2d 626. Jones v. United States, 10 Cir., 251 F.2d 288; Tandberg-Hanssen v. United States, 10 Cir., 284 F.2d 331; Williams v. United States, 8 Cir., 272 F. 2d 40; Hughes v. United States, 10 Cir., 320 F.2d 459; NLRB v. Northern California District Council of Hod Carriers, etc., supra, 389 F.2d at page 724.

9. NLRB v. Burnett Construction Company, 10 Cir., 350 F.2d 57, 60; Brooks v. NLRB, 348 U.S. 96, 101, 75 S.Ct. 176, 99 L.Ed. 125.

reasonable time thereafter, regardless of any change in the Union's majority status during such reasonable period.[10]

The cases cited in notes 9 and 10 recognize that there should be a reasonable time during which good faith collective bargaining should take place in an atmosphere insulated against the pressures attendant on the necessity of constantly showing the continuation of majority status.

 Here, the employer, after the execution of the settlement agreement by which it was relieved of unfair labor charges and in which it expressly agreed upon request to bargain collectively with the Union as the exclusive representative of the employees in the unit, in response to the first request to bargain, made by the Union after the settlement agreement, refused to do so, unless at a meeting of the employees the Union's continuing majority status was established. Such refusal was before the certification year had expired, and a little more than a week after the execution of the settlement agreement, and obviously was within a reasonable period of time after the settlement agreement.

Shortly after the meeting of November 6, 1965, the employer, without any prior negotiation with the Union, granted a 25-cent per hour wage increase, which was a unilateral action, and was a direct violation of § 8(a) (5) and (1) of the Act[11] and also of the settlement agreement.

The lack of good faith on the part of the employer is also shown by the unrealistic contract proposals it made to the Union on December 16, 1965.

We think there could be no doubt from the evidence that the employer continuously refused to bargain with the Union in good faith after the settlement agreement.

The attempt of the supervisors, after transporting the employees to the meeting place, to gain entrance to the meeting place of the employees on November 6, 1965, was plainly an attempt at surveillance and was a violation of the Act.[12]

The flagrant violations by the employer of the provisions of the settlement agreement fully justified the Board in setting aside such agreement.

Accordingly we conclude that the order of the Board should be and it will be enforced.

---

10. W. B. Johnston Grain Company v. NLRB, 10 Cir., 365 F.2d 582, 586.

11. NLRB v. Katz, 369 U.S. 736, 742, 82 S.Ct. 1107, 8 L.Ed.2d 230.

12. NLRB v. Ralph Printing and Lithographing Company, 8 Cir., 379 F.2d 687, 691.