NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

FABSTEEL COMPANY OF
LOUISIANA, Respondent.

No. 77–3079.

United States Court of Appeals,
Fifth Circuit.

Jan. 10, 1979.

Elliott Moore, Deputy Associate Gen.
Counsel, Marjorie Gofreed, Atty., John S.

Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

Andrew C. Partee, Jr., New Orleans, La., Cecil E. Ramey, Jr., Shreveport, La., for respondent.

Before RONEY, RUBIN and VANCE, Circuit Judges.

VANCE, Circuit Judge:

This case comes to us on the National Labor Relations Board's petition to enforce its order issued against Fabsteel Company of Louisiana (Fabsteel) on September 12, 1977.[1]

The Board found that by virtue of its purchase of the Shreveport plant of Mosher Steel Company (Mosher), Fabsteel was a successor to Mosher with certain obligations under the National Labor Relations Act. The Board found that Fabsteel had violated Section 8(a)(3) and (1) of the Act by refusing to fulfill its obligation to remedy Mosher's unfair labor practices. The Board further found that Fabsteel had violated Section 8(a)(5) and (1) of the Act by refusing to bargain with the United Steelworkers of America, AFL–CIO (the Union). It ordered Fabsteel to cease and desist from refusing to bargain with the Union, ordered reinstatement of named employees with back pay and granted other relief.

Fabsteel presents two issues. (1) Whether a successor, within these facts, has the obligation to remedy its predecessor's unfair labor practices by reinstating unfair labor practice strikers. (2) Whether a successor, within these facts, has an obligation to bargain with the Union which was certified as bargaining agent for employees of its predecessor.

The unfolding area of the law of successorship has been before the Supreme Court on several occasions. The first was in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). That holding was later described by the court as "properly cautious and narrow." *Howard Johnson Company, Inc. v. Detroit Local Joint Executive Board, Hotel and Restaurant Employees and Bartenders International Union*, 417 U.S. 249, 254, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). The development since *Wiley* has been on a case by case approach. In its most recent opinion, the Supreme Court stated:

> Particularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate. The Court was obviously well aware of this in *Wiley*, as its guarded, almost tentative statement of its holding amply demonstrates.

*Howard Johnson, supra*, at 256, 94 S.Ct. at 2240. It is necessary, therefore, that we give particular attention to the facts in the case before us.

### Factual History

On August 30, 1973, a company wide election was held at Mosher's seven plants.[2] The stipulated unit was all production and maintenance employees at all seven plants, including leadmen, truckdrivers, janitors, and plant clericals.

On January 18, 1974, the NLRB found that the stipulated unit was an appropriate one and that the Union had received a majority of the employees' votes. On that date the Board certified the Union as the exclusive representative of Mosher's employees in the bargaining unit.

---

1. The Board's decision and order is reported at 231 N.L.R.B. No. 50.

2. The seven plants consisted of plants located at: 3910 Washington and 6422 Esperson Street, Houston, Texas; San Antonio, Texas; Dallas, Texas; Lubbock, Texas; Tyler, Texas; and Shreveport, Louisiana. The case before us concerns incidents arising out of the Shreveport plant.

On July 22, 1974, a strike involving a great majority of the employees in the unit commenced. At the Shreveport plant Mosher had approximately 67 employees in the unit on July 22. Sixty-five of those employees went out on strike. Mosher hired approximately 30 new employees and 21 of the strikers returned to work. The strike concluded at the Shreveport plant on May 12, 1975. On or about that same day, Mosher received unconditional offers from the strikers. None was reinstated at that time. Prior to December 31, 1975, however, seven employees were returned to work. Another five were refused reinstatement based on grounds of alleged misconduct.[3]

On September 16, 1975, the Board found[4] that Mosher had engaged in conduct violative of Section 8(a)(5) and (1), and that the strike was an unfair labor practice strike caused and prolonged by Mosher's unfair labor practices. The Board ordered Mosher to bargain with the Union and to reinstate unfair labor practice strikers upon unconditional applications for reinstatement. We enforced this order on May 14, 1976. *Mosher Steel Co. v. NLRB*, 532 F.2d 1374 (5th Cir. 1976).

### Enter Fabsteel

An agreement was entered on December 10, 1975, between Mosher and Fabsteel for sale to Fabsteel of the real estate, buildings, structures, machinery and equipment, tangible personal property, raw material and inventory, which constituted Mosher's Shreveport plant. At the time of the agreement, Fabsteel was aware of the Board's outstanding order against Mosher, and Fabsteel and Mosher had made arrangements concerning potential back pay and reinstatement obligations. Pursuant to this agreement, Mosher terminated its Shreveport operation on December 31, 1975, and Fabsteel commenced its operation on January 1, 1976. As of December 31 Mosher terminated its entire employee complement which consisted of 56 non-supervisory employees. On the same day Fabsteel took applications from all Mosher employees and hired all interested employees. It commenced operation with the identical employee complement that Mosher had prior to its termination.

By letter from its attorney on December 17, 1975, the Union notified Fabsteel of the Board's findings and order relating to Mosher's obligation to bargain and to the unfair labor practice strikers' rights to reinstatement. At that time the Union requested Fabsteel to bargain and to reinstate the strikers. At all times commencing on or about January 5, 1976, Fabsteel has refused to bargain with the Union or to reinstate the strikers.

Fabsteel admits that it is a successor for some purposes, but contends that it is not a successor in the sense of being obliged to remedy Mosher's unfair labor practices or to bargain with the Union. We disagree with both contentions.

### The Successor's Obligation To Remedy Unfair Labor Practices

The Board found that Fabsteel violated Section 8(a)(3) and (1) of the Act by failing to reinstate 22 unfair labor practice strik-

---

**3.** The Administrative Law Judge, whose opinion was adopted in full by the Board, specifically noted and took into consideration these five strikers as is evidenced by the following excerpt:

> I officially note that the question of such misconduct's bearing on the five individual unfair labor practice strikers' right to reinstatement was litigated in a proceeding before Administrative Law Judge Jalette. The Board in *Mosher Steel Company*, 226 NLRB No. 180, found that Mosher Steel Shreveport unfair labor practice strikers Robert Wilkerson, Charles Stiles, and Benny Harris engaged in striker misconduct justifying a re-

fusal to reinstate such employees. The conduct of Mosher Steel Company Shreveport unfair labor practice strikers Roosevelt Washington and Lee Taylor was found in effect to be of such a nature as not to impair their rights to reinstatement as unfair labor practice strikers, and it was found that the refusal to reinstate Washington and Taylor violated Section 8(a)(3) and (1) of the Act. Appropriate remedial order of reinstatement and backpay was issued in said decision on November 24, 1976.

**4.** *The Board's Decision and Order is reported at* 220 N.L.R.B. No. 47 (1975).

ers. The Board's determination[5] that, at least, the 22 strikers involved here, were unfair labor practice strikers and were entitled to reinstatement by Mosher is not contested by Fabsteel. Under settled law, Mosher was obligated to rehire these strikers. *NLRB v. Safeway Steel Scaffolds Company of Georgia*, 383 F.2d 273 (5th Cir. 1967), *cert. denied* 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1968). Fabsteel, however, contends that it has no obligation to reinstate the strikers.

The Board's finding that Fabsteel was a successor to Mosher with an obligation to reinstate the strikers was based on *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), which affirmed the ninth circuit's enforcement[6] of a Board order. In that case, All American Beverages, Inc. had acquired Golden State's business and continued the business without interruption or substantial change in operation, employee complement, or supervisory personnel. The Board found that since All American had acquired the business with knowledge of an outstanding Board order to reinstate with back pay a discharged employee, it was a successor for purposes of the Act and liable for the rein-

statement of the discharged employee with back pay.

Fabsteel views the present Board holding as an overstatement of *Golden State*. It complains that the Board erred in making an initial determination that Fabsteel is a successor and then in automatically imposing all of Mosher's obligations on Fabsteel following such determination of successorship. Although we agree that such a two step approach would be inappropriate[7] we do not agree that the result achieved by the Board in this case is incorrect.

■ *Golden State* addressed the correct decisional process as follows:

The Board's decisional process in the *Perma Vinyl* line of cases has involved striking a balance between the conflicting legitimate interests of the bona fide successor, the public, and the affected employee. What we said of the Board's decisional process in another context is pertinent here:

"The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primari-

5. Mosher Steel Company, 220 N.L.R.B. No. 47 (1975).

6. *Golden State Bottling Co. v. NLRB*, 467 F.2d 164 (9th Cir. 1972).

7. The Court of Appeals stated that "[t]he first question we must face is whether Howard Johnson is a successor employer," 482 F.2d, at 492, and, finding that it was, that the next question was whether a successor is required to arbitrate under the collective-bargaining agreement of its predecessor, *id.*, at 494, which the court found was resolved by *Wiley.* We do not believe that this artificial division between these questions is a helpful or appropriate way to approach these problems. The question whether Howard Johnson is a "successor" is simply not meaningful in the abstract. Howard Johnson is of course a successor employer in the sense that it succeeded to operation of a restaurant and motor lodge formerly operated by the Grissoms. But the real question in each of these "successorship" cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative? The answer

to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of "successor" which is applicable in every legal context. A new employer, in other words, may be a successor for some purposes and not for others. See *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 181, 94 S.Ct. 414, 423, 38 L.Ed.2d 388 (1973). *International Ass'n of Machinists v. NLRB*, 134 U.S.App.D.C. 239, 244, 414 F.2d 1135, 1140 (1969) (Leventhal, J., concurring); Goldberg, The Labor Law Obligations of a Successor Employer, 63 Nw. U.L.Rev. 735 (1969); Comment, Contractual Successorship: The Impact of Burns, 40 U.Chi.L.Rev. 617, 619 n. 10 (1973).
*Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel and Restaurant Employees and Bartenders International Union, supra*, 417 U.S. at 263, n. 9, 94 S.Ct. at 2243 n. 9.

ly to the National Labor Relations Board, subject to limited judicial review." *NLRB v. Truck Drivers Local Union 449 International Brotherhood of Teamsters,* 353U.S. [sic] 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957).

The Board's *Perma Vinyl* principles introduced into the balancing process an emphasis upon protection for the victimized employee:

"Especially in need of help, it seems to us, are the employee victims of unfair labor practices who, because of their unlawful discharge, are now without meaningful remedy when title to the employing business operation changes hands." 164 N.L.R.B., at 969.

*Golden State Bottling Co., supra,* 414 U.S. at 181, 94 S.Ct. at 423. In the case before us the Board properly balanced the equities. Its findings are supported by the record and are therefore due to be enforced. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Fabsteel contends, however, that in balancing the equities the Board failed to take into consideration the fact that Mosher could reinstate these employees at other plants and that it also did not adequately consider the hardship that would be visited upon those employees hired to replace the strikers.

The first of these contentions was disposed of in the Administrative Law Judge's opinion, adopted in full by the Board:

Further evidence was offered and received to the effect that, in 1976, Mosher Steel offered certain of the unreinstated unfair labor practice strikers jobs at other Mosher Steel plants, with moving expenses. Certain of such employees accepted such reinstatement but advised Respondent, Fabsteel, that they desired reinstatement at the Shreveport plant. First, parties cannot by private agreements undermine the responsibilities to comply with the National Labor Relations Act or remedial orders of the Board. Secondly, offer of jobs away from the employing enterprise which is continuing does not constitute an offer of reinstate-

ment which effectuates the purposes of the Act.[19]

[19] See, *M. J. McCarthy Motor Sales Co.,* 147 NLRB 605, and cases cited therein.

The Board's position finds support in cases involving reinstatement of strikers in other situations not involving successorships. *See NLRB v. Madison Courier, Inc.,* 153 U.S. App.D.C. 232, 472 F.2d 1307 (1972); *Florence Printing Co. v. NLRB,* 376 F.2d 216 (4th Cir.), *cert. denied* 389 U.S. 840, 88 S.Ct. 68, 19 L.Ed.2d 104 (1967).

■ The second contention is equally lacking in merit. We have recently held in a case not involving a successorship that unreinstated unfair labor practice strikers are entitled to reinstatement regardless of the fact that permanent replacements have been hired. *NLRB v. Pope Maintenance Corp.,* 573 F.2d 898 (5th Cir. 1978). We perceive no reason to change the law because a successor is involved. This is especially true when the successor has knowledge of an outstanding Board order requiring reinstatement.

## The Successor's Obligation to Bargain

The second issue is whether substantial evidence on the record as a whole supports the Board's finding that Fabsteel had an obligation to bargain with the Union as a representative of its employees.

Fabsteel contends that it had doubt that the employees hired by it had an allegiance to the Union and a desire for representation by it. The employer relies on *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) and its holding that a successor has a right to refuse recognition of a union when it reasonably entertains a good faith doubt of such majority. *Id.* at 278–279, 92 S.Ct. 1571.

The Board found, however, that the certification was binding on Fabsteel and that it had no reasonable basis for a good faith doubt of the Union's majority status. It found that Fabsteel's refusal to recognize and bargain with the Union was a violation of Section 8(a)(5) and (1) of the Act. *NLRB v. Leatherwood Drilling Co.,* 513 F.2d 270,

272 (5th Cir.), *cert. denied,* 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975).

■ We agree that substantial evidence supports the finding of no reasonable ground for a good faith doubt of the Union's continuing majority status. Under *Universal Camera Corp. v. NLRB, supra,* this conclusion. is sufficient for enforcement of the Board's order. Because of the novelty of the issue, however, we shall examine Fabsteel's contentions more closely than otherwise would be required.

Fabsteel contends that after recognizing that the unit had changed within the meaning of *Burns,* the Board relied on mathematics to find majority status and misapplied the arithmetic. Fabsteel argues that there necessarily has been a change in the bargaining unit because a seven plant unit was certified and it purchased only one of those seven plants.

The Board did not find that the unit had changed within the meaning of *Burns* :

Under the *Burns* doctrine, one of the factors for consideration as to a Respondent's obligation to bargain as a "successor" is whether there is a question as to majority status regard the Union. In this case, the certified bargaining unit covered 7 plants geographically separated. Normally slight increases or decreases of employees in a bargaining unit are persumed [sic] not to affect the majority status of the representative. It would appear that the presumption of majority accorded a representative as to an overall unit of plants would be a presumption of equal distribution throughout the whole unit and that the presumption would apply equally as to the individual plants involved. Absent some evidence of employee dissatisfaction or change, such presumption would continue to constitute evidence of a majority status throughout the unit was [sic] well as in the separate parts of the overall unit.

We do not read *Burns,* as Fabsteel suggests, to exclude the present situation from control by the stated rule. The *Burns* court specified two such exclusions, neither of which encompasses our situation:

It would be a wholly different case if the Board had determined that because Burns' operational structure and practices differed from those of Wackenhut, the Lockheed bargaining unit was no longer an appropriate one. Likewise, it would be different if Burns had not hired employees already represented by a union certified as a bargaining agent . . . . But where the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a recently certified bargaining agent there is little basis for faulting the Board's implementation of the express mandates of § 8(a)(5) and § 9(a) by ordering the employer to bargain with the incumbent union. This is the view of several courts of appeals and we agree with those courts. *NLRB v. Zayre Corp.,* 424 F.2d 1159, 1162 (CA5 1970); *Tom-A-Hawk Transit, Inc. v. NLRB,* 419 F.2d 1025, 1026–1027 (CA7 1969); *S. S. Kresge Co. v. NLRB,* 416 F.2d 1225, 1234 (CA6 1969); *NLRB v. McFarland,* 306 F.2d, [219] at 220.

*Burns, supra,* 406 U.S. at 280, 92 S.Ct. 1571, 1579 (footnotes omitted).

Fabsteel concedes that the Shreveport plant was a separate appropriate unit for bargaining. Although it was not obligated to do so,[8] it chose to hire the identical employee complement. Our enforcement of the Board's order requiring Fabsteel to reinstate the unfair labor practice strikers makes it quite apparent that a majority of Fabsteel's employees after such reinstatement will be represented by the certified Union.

---

8.   The Board has never held that the National Labor Relations Act itself requires that an employer who submits the winning bid for a service contract or who purchases the assets of a business be obligated to hire all of the ' employees of the predecessor though it is

possible that such an obligation might be assumed by the employer. *But cf. Chemrock Corp.,* 151 N.L.R.B. 1074 (1965).

*NLRB v. Burns International Security Services, Inc., supra,* at 406 U.S. 280 n. 5, 92 S.Ct. at 1578 n. 5.

From the holding in *Burns,* Fabsteel would have us extrapolate a rule that if there were a change in the certified unit no obligation to bargain would survive. Fabsteel does not attempt to state what type of change, if any, would merit such a conclusion. The Supreme Court has not given meaningful indication as to what specific type of change, if any, in a unit would warrant a refusal to bargain absent at least a good faith doubt as to the majority status of the Union's representation. A few courts have opined that changes, which are at least analogous to what Fabsteel contends is a change here, do not relieve a successor of its obligation to bargain with the Union. The Board has long held, with court approval, that under proper circumstances, the obligation to bargain with an incumbent union may be found although the work force is considerably diminished by the transfer. *See, e. g., NLRB v. Polytech, Inc.,* 469 F.2d 1226, 1230 (8th Cir. 1972); *NLRB v. McFarland,* 306 F.2d 219, 221 (10th Cir. 1962); *NLRB v. Armato,* 199 F.2d 800, 803 (7th Cir. 1952). The Board, with court approval, has similarly found a bargaining obligation though the transfer in ownership results in a division of the bargaining unit into two or more separate units, where, as here, each unit is independently appropriate. *Nazareth Regional High School v. NLRB,* 549 F.2d 873, 880 (2nd Cir. 1977); *Zim's Foodliner, Inc. v. NLRB,* 495 F.2d 1131, 1141 (7th Cir.), *cert. denied* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974); *N.L.R.B. v. Geronimo Service Co.,* 467 F.2d 903 (10th Cir. 1972); *Ranch-Way, Inc.,* 445 F.2d 625 (10th Cir. 1971), *vacated and remanded on other grounds,* 406 U.S. 940, 92 S.Ct. 2037, 32 L.Ed.2d 328 (1972). As the seventh circuit has stated,

> Once it is determined that the successor unit is appropriate for bargaining, a change in unit definition, from large to smaller units, would seem not to raise any additional considerations beyond those [posed by a numerical diminution in unit size].

*Zim's Foodliner, Inc. v. NLRB, supra,* at 1141.

Finally, we do not agree that the Board's arithmetic was misapplied. By either of two approaches, the status of the Union's majority is not susceptible of a good faith doubt. Twenty-one of the 56 employees that Fabsteel had employed were strikers who had returned to work. No inference could be drawn that the employees who returned to work prior to the conclusion of the strike had abandoned the Union. *Nazareth Regional High School v. NLRB, supra* at 880. Seven of the 56 had been strikers who had been reinstated. Our arithmetic and the Board's adds up to 28 union employees, which is 50% of the employee complement. Since we have already concluded that Fabsteel was obligated to reinstate the 22 unfair labor practice strikers the 22 strike replacements could not be counted. *NLRB v. Frick Co.,* 423 F.2d 1327, 1334 (3rd Cir. 1970). The bottom line under this approach adds up to 28 out of 34, a clear majority.

The other approach similarly supports the Board's finding. The bargaining unit consisted of 78 employees. Fifty six of these employees were actually employed and an additional 22 are entitled to reinstatement. Twenty eight of the 56 were union supporters who had been out on strike. Together with the 22 who are entitled to reinstatement this makes a total of 50 out of 78, again a clear majority.

ENFORCED.