**W & W STEEL COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 77–1915.

United States Court of Appeals, Tenth Circuit.

Submitted March 14, 1979.

Decided May 31, 1979.

Rehearing Denied Sept. 21, 1979.

Edward E. Soule of Lytle, Soule & Emery, Oklahoma City, Okl., for petitioner.

Michael F. Messitte, N. L. R. B., Washington, D. C. (John D. Burgoyne, John S. Irving, John E. Higgins, Jr., Carl L. Taylor and Elliott Moore, N. L. R. B., Washington, D. C., on the brief), for respondent.

Before HOLLOWAY, BARRETT and McKAY, Circuit Judges.

BARRETT, Circuit Judge.

W & W Steel Company (W&W) petitions to set aside an order of the National Labor Relations Board (Board) issued September 19, 1977. Board ruled, *inter alia*, that W&W was a successor employer, W&W did not have a reasonable basis for a good faith doubt to the United Steel Workers of America's (Union) majority status, and that by refusing to bargain with Union, W&W violated Section 8(a)(5) and (1) of the National Labor Relations Act (Act), 29 U.S. C.A. § 151, *et seq.* Board has cross-applied for enforcement of its order.

Prior to April 1, 1976, Mosher Steel Company (Mosher) owned and operated a steel plant at Lubbock, Texas. On August 30, 1973, Board held an election for some 980 Mosher employees located at seven different plants, including those at Lubbock. Ballots from all plants were commingled, and then counted. Only thirty (30) of the approximately fifty (50) employees at the Lubbock plant voted. It is not known how they voted. The total votes cast were 511 for Union and 378 against. Thereafter, on January 18, 1974, Board certified Union as the exclusive collective bargaining representative for a company-wide unit of production and maintenance employees employed in Mosher's seven plants.

Union struck Mosher July 22, 1974 and 27 of the 51 unit employees at Lubbock went out. The strike concluded on May 12, 1975. Thereafter, all but 11 Lubbock strikers returned to work.

On December 16, 1975, W&W entered into contract to purchase the Lubbock plant with an effective take-over date of April 1, 1976. Under the terms of the contract, W&W agreed to purchase Mosher's assets. During the course of the contract negotiations, Mosher indicated that Lubbock was not a union plant. W&W did "hear" about a union being involved at the plant in January, 1976, although Union did not contact W&W until April 8, 1976, one week after W&W assumed operations of the plant. In assuming operations of the Lubbock plant, W&W utilized substantially all of Mosher's managerial personnel and thirty-seven (37) bargaining unit employees. It is uncontested that W&W operated the plant for the fabrication of steel and steel products in a manner relatively similar to Mosher's operation.

By letter of April 8, 1976, Union demanded that W&W bargain with it as the exclusive bargaining representative for all W&W production and maintenance employees. Union claimed to be the representative of Mosher employees in an appropriate unit which included employees of the Mosher plant at Lubbock; however, it did not disclose that its certification related to the multi-plant company-wide unit of Mosher employees. Thereafter, W&W requested a copy of Union's certification and Union forwarded a copy of the seven-plant unit certification.

Following receipt of the seven-plant unit certification, and with knowledge that an election had never been held as a unit for the Lubbock plant, W&W petitioned Board on May 4, 1976, for an election for the Lubbock employees to determine if they desired to be represented by Union. Union responded May 10, 1976 that it was not agreeable to an election and related that it was filing unfair labor practice charges against W&W. Without knowledge to W&W, Union had in fact filed unfair labor practice charges against W&W on April 29, 1976. Notice of these charges, however, was not received by W&W until May 11, 1976, a full week after W&W had petitioned for an election. On May 26, 1976, employees at the plant, acting through their own counsel, petitioned Board for an election.

Board declined to act on the petitions for an election until September 21, 1976. At that time it simultaneously rejected the petitions and issued a complaint against W&W alleging that from and after May 4, 1976, W&W had unlawfully refused to bargain with Union.

The complaint against W&W was heard before an administrative law judge (ALJ) on November 10, 1976. During the course of the hearing extensive oral and written evidence was presented by both parties.

On April 11, 1977, the ALJ ruled in favor of W&W and dismissed the complaint in its entirety. The ALJ held that W&W was not a successor for bargaining purposes based on the dictates of *National Labor Relations Board v. Burns*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972):

> . . . The critical question is whether the Respondent is a successor for bargaining purposes within the meaning of *NLRB v. Burns International Security Services*, 406 U.S. 272 [92 S.Ct. 1571, 32 L.Ed.2d 61] (1972).

In my opinion, the evidence supports the General Counsel's theory of successorship obligation to bargain in all respects except one. Thus, the facts reveal that a majority of Respondent's employees hired on April 1, 1976, were employees of Mosher Steel prior to April 1, 1976. Such changes as to work station, commercial or industrial type work, shuffling of supervision, or newer type machinery, do not in this case reveal a material change in the enterprise or structure. Essentially the same employees are doing the same type work at the same location. Unlike the *Burns'* requirement that there be no significant reason to question the Union's majority representative status, the facts in this case reveal that there is a question of the Union's representative status. Thus, of the 37 [11] employee complement

[11] Of the 39 hired, 2 were supervisors. Thus, there were 37 non-supervisory employees in the bargaining unit.

hired on April 1, 1976, only 8 of such employees have revealed themselves to have been union adherents or supporters, the other 29 employees included 13 employees who had worked but had not participated in strike activity at Mosher Steel in 1974, and included 16 employees hired after the commencement of the 1974 strike or after the strike and who are not shown to have participated in Union activity. The 12 employees who were hired on April 20, 1976, and May 3, 1976, were new employees who had not worked for Mosher Steel.

Although there is a weak presumption that in 1974, as a result of the certification, a majority of the employees in the Lubbock portion of the overall 7 plant unit supported the Union, the overall facts herein destroy such presumption. The facts herein reveal that on April 1, 1976, there were 11 unreinstated Mosher Steel unfair labor practice strikers. The stipulation as to these persons, however, was broad and to the effect that their failure of return was either voluntary or unvoluntary.

[R., Vol. III, pp. 380–381.]

Union did not appeal the decision of the ALJ. Board counsel, however, appealed on behalf of Board's Houston office. On September 19, 1977, Board entered its order herein reversing the ALJ.

In ordering that W&W cease and desist from refusing to bargain with Union, Board held, *inter alia* : "General Counsel does not contend that Respondent [W&W] took [over] with knowledge of the predecessor's unfair labor practices or that it had any obligations to remedy those violations of the Act"; W&W maintained the same basic enterprise as had its predecessor Mosher; W&W did not have a reasonable basis to doubt Union's majority status; no significant question exists as to Union's majority status; and W&W violated Section 8(a)(5) and (1) of the Act by refusing to bargain with Union on and after April 8, 1976.

Within its petition presented here to set aside Board's order, W&W contends: (1) it is not a successor to Mosher under *Burns* and is not bound by the Board's seven plant certification of Union for Mosher; and (2) W&W and its employees are entitled to have an election held for the Lubbock employees to decide whether they will be represented by Union. In its cross-application for enforcement of its order, Board counterstates the issue as: Whether substantial evidence on the record as a whole supports the Board's finding that W&W Steel Company is a successor employer which violated § 8(a)(5) and (1) of the Act by refusing to bargain with the certified incumbent Union?

We hold that substantial evidence is not present in the record supportive of the Board's determination that W&W was a successor employer obligated to bargain with Union. Accordingly, enforcement of the order will be denied.

■ We have held that a union's certification as an exclusive bargaining representative obligates an employer to bargain with the union for at least one year from the date of certification irrespective of the union's *de facto* majority status during such period. *National Labor Relations Board v. Shurtenda Steaks, Inc.,* 397 F.2d 939 (10th

Cir. 1968) and cases cited therein. When an employer doubts a union's majority, he cannot establish a good faith doubt merely by his subjective frame of mind; rather, he must show a rational basis in fact for the doubt. *National Labor Relations Board v. King Radio Corporation*, 510 F.2d 1154 (10th Cir. 1975), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975).

▪ The successorship of an employer is established if the employing industry continues essentially in utilizing the majority of the predecessor's employees. *National Labor Relations Board v. Geronimo Service Company*, 467 F.2d 903 (10th Cir. 1972). In *Geronimo, supra*, we noted that a successor employer taking over union employees employs "such employees in that status for so long as the certification remains valid under traditional and established rules," citing to *Burns*. The disposition herein, then, clearly turns on an analysis of *Burns vis-a-vis* the facts before us.

At the outset, the Court, in *Burns*, noted that "Resolution turns to a great extent on the precise facts involved here." 406 U.S. at p. 274, 92 S.Ct. at p. 1575. The Court there delineated some of the "precise facts" involved, which included: Burns Security was notified on May 15, prior to a July 1 takeover, of a security service contract; that the union employees had, on February 28, selected the union as their exclusive bargaining agent; during June, before the July 1 takeover, Burns supplied the employees with uniforms and gave them membership cards in another union, relating that they would not receive the uniforms unless they joined the alternative union because Burns Security "could not live with" the existing contract; and that prior to its July 1 takeover Burns recognized its alternative union on the theory that it had obtained a card majority. In holding that Burns Security had violated the Act by refusing to bargain with the certified union, the Court opined:

It is undisputed that Burns knew all the relevant facts in this regard and was aware of the certification and of the existence of the collective-bargaining contract.

406 U.S. at p. 278, 92 S.Ct. at p. 1577. The Court further stated:

It would be a wholly different case if the Board had determined that because Burns' operational structure and practices differed from those of Wackenhut, the Lockheed bargaining unit was no longer an appropriate one. Likewise, it would be different if Burns had not hired employees already represented by a union certified as a bargaining agent, and the Board recognized as much at oral argument. *But where the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a recently certified bargaining agent* there is little basis for faulting the Board's implementation of the express mandates of § 8(a)(5) and § 9(a) by ordering the employer to bargain with the incumbent union. (Emphasis supplied.)

406 U.S. at pp. 280–281, 92 S.Ct. at pp. 1578–1579.

▪ Applying this standard to the facts herein, we hold that the Board's order should not be enforced. Assuming, arguendo, that W&W was in fact a successor employer, the facts in this record clearly establish, by substantial evidence, that W&W had a reasonable good faith doubt as to Union's status at the time it took over the plant, and that W&W was therefore entitled to an election. Unlike Burns Security, W&W was not aware of the Union's position until after April 8, 1976; W&W did not engage in any unfair labor practices in hiring its employees; W&W, as recognized by General Counsel, was not even aware of the past labor problems at Mosher; the employees at the Lubbock plant were not represented by a recently certified bargaining agent, the election having taken place some two years and seven months prior to W&W's takeover; the record is devoid of any evidence whatsoever that the Union represented a majority of the employees at the Lubbock plant inasmuch as an election had never been held expressly for the Lubbock plant; and, Union did not tender the

votes of the 30 Lubbock plant employees who voted. Finally, and importantly, the bargaining unit herein did not remain unchanged after W&W took over the plant.

■ Both the ALJ and the Board concluded that the Lubbock plant constituted an appropriate bargaining unit. We agree. However, it does not follow that such a plant constitutes an "unchanged" bargaining unit under Burns, when, as here, it is clear that the employees were not represented by a "recently certified bargaining agent," inasmuch as the election for the seven-plant company-wide unit occurred some two years and seven months prior to W&W's takeover.

■ When these standards are applied to the applicable facts herein, we must hold that W&W cannot be considered a successor employer. These facts include: the election was held in August, 1973, and W&W took over in April, 1976; only 30 employees voted in the election at the Lubbock plant out of a total work force of approximately 50; it is unknown how the employees voted; an election for representative purposes for the Lubbock plant has never been held; during the Mosher labor strike many of the workers returned to work shortly after the strike commenced; of the employees hired by W&W who had previously worked for Mosher only 8 revealed themselves to be union adherents and of the remaining 41, 13 had worked for Mosher but had not participated in the strike activity, 16 were hired by Mosher after the strike, and 12 were hired by W&W after April 1, 1976; at the time W&W took over the plant there were still 11 unreinstated Mosher strikers; it has never been alleged that W&W engaged in any unfair labor practices or demonstrated union animus; and the sole allegation is that W&W has wrongfully failed to bargain.

In light of these facts, we hold that the order of the Board cannot be enforced. Although the Lubbock plant did constitute an appropriate independent bargaining unit, it did not constitute an "unchanged" bargaining unit represented by a "recently certified bargaining agent." In our view, considera-

ble time, expense and litigation could have been avoided entirely, and should have been, had the Board honored W&W's request of May 4, 1976 for an election.

Throughout these proceedings Board has failed to present substantial evidence supportive of its conclusion that W&W did not have a good faith doubt of Union's majority position. In *National Car Rental System, Inc. v. National Labor Relations Board*, 594 F.2d 1203 (8th Cir. 1979), the Court observed in part:

We conclude that there was no substantial evidence to support the Board's conclusion that National did not have a good faith doubt that the union continued to represent a majority of its employees. A Board created presumption does not rise to the level of "substantial evidence."

### [Burden Shifted]

When we consider the reasons given by National together "we believe that good faith doubt has been demonstrated at least to the point of requiring the General Counsel to come forward with evidence that the union did represent a majority of the employees in the unit on the refusal to bargain date." *National Cash Register Co. v. NLRB, supra,* [8 Cir.] 494 F.2d [189] at 194. *Accord, Automated Business Systems v. NLRB* [74 LC ¶ 10,063] 497 F.2d 262, 270 (6th Cir. 1974).

Therefore, we decline the Board's request to enforce its order since an employer with a reasonably grounded belief that a union does not represent a majority of its employees cannot be found guilty of a section 8(a)(5) or 8(a)(1) violation. *National Cash Register Co. v. NLRB, supra,* 494 F.2d 189; *NLRB v. Dayton Motels, Inc.,* [70 LC ¶ 13,413] 474 F.2d 328, 331–32 (6th Cir. 1973). It follows that the company has not committed an unfair labor practice in refusing to bargain with the union. *NLRB v. Gopher Aviation, Inc.,* [58 LC ¶ 13,006] 402 F.2d 176, 179 (8th Cir. 1968). . . .
85 Lab.Cas. § 11,159, at 20,558.

Several additional arguments presented by the Board merit comment. Board argues, citing to *Nazareth Regional High School v. National Labor Relations Board*, 549 F.2d 873 (2nd Cir. 1977) that the filing of the decertification petition by W&W's employees after the unfair labor practices had been lodged herein does not support W&W's claim of good faith doubt. We agree that the employees' election request filed on May 26, 1976 cannot be considered supportive of W&W's election request filed on May 4, 1976. This however does not vitiate the efficacy or validity of W&W's election request of May 4, 1976 which was predicated on the fact that there had never been a board election held exclusively for the employees at the Lubbock plant and that the Union was certified in a seven-plant election.

■ Board's argument that it properly declined to process W&W's decertification petition because the Union had filed unfair labor charges, citing to our *Furr's, Inc. v. National Labor Relations Board*, 350 F.2d 84 (10th Cir. 1965), *cert. denied*, 389 U.S. 840, 88 S.Ct. 70, 19 L.Ed.2d 105 (1967) and *National Labor Relations Board v. Groendyke Transport, Inc.*, 417 F.2d 33 (10th Cir. 1969), *cert. denied*, 397 U.S. 935, 90 S.Ct. 944, 25 L.Ed.2d 116 (1970), is without merit. When, as here, the election petition was filed a full week prior to W&W receiving notice that unfair labor practice charges, i. e., refusal to bargain, had been filed against it, no credence may be given to the Union's filing.

Board's reliance on *National Labor Relations Board v. Fabsteel Company of Louisiana*, 587 F.2d 689 (5th Cir. 1979) is also misplaced. In that case Fabsteel was fully aware of the Board's outstanding order against Mosher for its past unfair labor practices, "and Fabsteel and Mosher had made arrangements concerning potential back pay and reinstatement obligations." Fabsteel thereafter refused to remedy Mosher's unfair labor practices and bargain with Union.

As noted, *supra*, the record herein is void of any allegation, evidence, or indication

that W&W proceeded in bad faith or with union animus. To the contrary, the record establishes that W&W proceeded in good faith in requesting the election to determine whether a majority of its newly acquired employees desired to be represented by the union. This same good faith contention was presented during oral argument before this court by counsel for W&W and it was not attacked or contradicted by counsel for the Board. This case exemplifies, in our view, the necessity of Board flexibility in administering the Act and its regulations in order to achieve the maximum benefits attainable under it—particularly, when, as here, the employer proceeded at all times in good faith, and an election would have avoided considerable litigation.

Enforcement denied.

McKAY, Circuit Judge, dissenting:

Much of the dispute in this case focuses on the implications of *N. L. R. B. v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). The Supreme Court in that case affirmed the Board's conclusion that a new employer was obligated to bargain with the union that a majority of its employees had recently chosen, even though those employees had selected the union while working for their previous employer. The Court was influenced by the fact that the new employer had hired its predecessor's employees to labor in the same manner and in the same place as they had done previously. *Id.* at 278, 92 S.Ct. 1571. The Court suggested that the result would have been different had the new employer "reasonably . . . entertained a good-faith doubt about" the union's representation of a majority of the employees. *Id.* While the Court did not expressly employ a "successor employer" analysis, it is apparent that such an analysis was implicated. *See id.* at 296, 299, 92 S.Ct. 1571, 1577 (Rehnquist, J., dissenting).[1]

The *Burns* rationale leads both parties in this case to advance a two-part test for resolution of this appeal: (1) Was W & W a

---

1. Justice Rehnquist was joined in dissent by Chief Justice Burger, Justice Brennan, and Justice Powell. The dissenters did not believe the successorship notion should have been extended to encompass the facts of the case.

successor employer to Mosher Steel Co.? (2) If so, was W & W obligated to bargain with the Union? Resolution of the second question turns on whether W & W had a reasonable good faith doubt that the Union represented a majority of the employees.

I believe that the Board's conclusion that W & W was a Mosher successor at the Lubbock plant is consistent with the relevant legal principles, and that its subsidiary factual determinations are supported by substantial evidence on the record as a whole. I therefore believe that resolution of this case depends on the second part of the analytic test.

It is settled that subjective good faith on the employer's part is not enough to justify a refusal to deal with a union. The employer "must show a rational basis in fact for doubt of majority status." *N. L. R. B. v. King Radio Corp.*, 510 F.2d 1154, 1156 (10th Cir.), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975) (emphasis added). If it cannot do so, its refusal to bargain is an unfair labor practice.

On the crucial issue of whether W & W had a reasonable good faith doubt as to the Union's majority support on and following April 8, 1976,[2] W & W relies on three factors: that only a minority of Lubbock employees supported an earlier strike; that the employees never separately voted for the Union; and that the employees themselves petitioned the Board for a new election. The Board was fully justified in finding that none of these factors provided a basis in fact for doubting W & W's majority support.

The numerical evidence concerning strike participation was properly deemed to be of no consequence. The failure of employees to engage in a strike has consistently been recognized as warranting no inference that the employees no longer desire a union's representation. *E. g., Nazareth Regional High School v. N. L. R. B.*, 549 F.2d 873, 880 (2d Cir. 1977); *Retail, Wholesale & Department Store Union, AFL–CIO v. N. L. R. B.*, 151 U.S.App.D.C. 209, 223, 466 F.2d 380, 394 (1972). The rationale for this rule is based on an understanding of human behavior. Reasons for not joining in a strike other than because of displeasure with a union are numerous. An employee might not participate in a strike because he fears loss of employment or loss of wages, or because he does not believe a particular strike is appropriate; he might nonetheless favor the union's representation.[3]

The showing that Lubbock employees had never voted separately for the Union, because their votes had been pooled with others cast in a multiplant election, is similarly inconsequential. The simple fact that the Lubbock ballots were comingled with others provides no more basis for assuming a lack of majority Union support at the Lubbock plant than it does for concluding the employees were unanimous in their support for the Union. The Board properly found this fact did not provide a good faith basis for believing the Union did not enjoy majority support at the plant. *See N. L. R. B. v. Fabsteel Co.*, 587 F.2d 689, 694 (5th Cir. 1979);[4] *N. L. R. B. v. Geronimo Service Co.*, 467 F.2d 903, 904 (10th Cir. 1972) (per curiam).

Finally, W & W introduced evidence that the employees themselves had petitioned

---

2. This was the date on which the Union formally notified W & W of its status as bargaining representative of the employees. Somewhat earlier W & W had learned that the Union was "involved" at the plant; several days later the Union sent a copy of its certification to W & W.

3. I must register my rejection of the Board's suggestion, made at oral argument, that the Board may have it both ways on this point. I would also consider that evidence of majority participation in a strike does not in the least indicate majority support for the union. Reasons for striking are as multifaceted as reasons

for not striking. An employee may oppose continued representation by a particular union, but nonetheless go on strike as a result of intimidation or social pressure, or because he happens to agree with the goals a strike is designed to achieve.

4. In *Fabsteel*, the Fifth Circuit enforced an NLRB order requiring an employer which had purchased one of the other Mosher plants to bargain with the Union.

the Board for a new election. Assuming the proper time sequence, such evidence would readily supply a reasonable basis for doubting a continued Union majority. In this case, however, the employee petition came to W & W's attention after its refusal to bargain with the Union. Therefore, as the majority acknowledges, this subsequent development could not have entered into the decision not to bargain.

The Board was fully justified in concluding that W & W's evidence did not provide a good faith basis for doubting the majority support of the Union. Absent such a good faith basis, W & W's refusal to recognize or bargain with the Union was unlawful. I would therefore enforce the Board's order.[5]

---

The *Fabsteel* court referred to the rule which forms the basis for my conclusion that the fact the Lubbock employees had never voted as a group does not provide a reasonable basis for doubting their majority support of the Union:

It would appear that the presumption of majority accorded a representative as to an overall unit of plants would be a presumption of equal distribution throughout the whole unit and that the presumption would apply equally as to the individual plants involved. Absent some evidence of employee dissatisfaction or change, such presumption would continue to constitute evidence of a majority status throughout the unit [as] . . . well as in the separate parts of the overall unit.

587 F.2d at 694. I acknowledge that this presumption has not received universal acclaim. *See, e. g., N. L. R. B. v. Tahoe Nugget, Inc.*, 584 F.2d 293, 302–03 & n.36 (9th Cir. 1978).

5. Although the majority seems to believe the Board's decision not to process W & W's election petition is somehow before us for review, it clearly is not. The decision, as well as the decision not to process the employees' decertification petition, grew out of a separate NLRB proceeding from the one which resulted in the instant order. We are limited to reviewing the single Board order before us; we have no mandate to rectify all aspects of the underlying dispute.