**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FOODWAY OF EL PASO, a Division of Kimbell Foods, Inc., Respondent.**

No. 73-2949.

United States Court of Appeals,
Fifth Circuit.

June 19, 1974.

Elliott Moore, Deputy Assoc. Gen. Counsel, Alan D. Longman, N. L. R. B., Washington, D. C., Milo V. Price, Director, Region 28, N. L. R. B., Albuquerque, N. M., for petitioner.

Stephen H. Naiman, Washington, D. C., for Retail Clerks Int. Assoc., Local 663.

Edward L. Kemble, Fort Worth, Tex., for respondent.

Before DYER and MORGAN, Circuit Judges, and KRAFT, District Judge.

DYER, Circuit Judge:

This case is before us upon the application of the Board for enforcement of its order issued against Foodway based upon findings that Foodway violated Section 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., by refusing to hire any of the non-supervisory unit employees formerly employed by its predecessor, Allied Discount Foods, because of the employees' membership in a union, and the Board's further finding of a violation of Section 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the Union. We enforce.

Allied operated three retail grocery stores in El Paso, Texas, one on Montana Avenue, the others on Dyer Street and McRae Street. The latter two stores were non-union. Employees at the Montana Avenue store had been represented by the Union [1] since 1967 and were covered by a multi-employer collective bargaining agreement effective for the period April 10, 1969 through April 8, 1973. The agreement contained a separate recognition clause for each employer, and with respect to Allied recognized the Union as the exclusive bargaining representative in a unit embracing the non-supervisory employees at the Montana Avenue store.

On August 19, 1971, Foodway agreed to purchase from Allied the existing leaseholds of the two non-union stores together with the fixtures, equipment, inventory, supplies and business there conducted. Foodway also agreed to hire all of the managerial and rank-and-file employees at both stores.

On August 28, 1971, Allied closed the Montana Avenue store, representing to the employees that this was done because the store was losing money. There were seventeen employees in the bargaining unit at that time, ten of whom were members of the Union. All were fired. Three days later Foodway agreed to purchase from Allied the leasehold of the Montana Avenue store together with the fixtures, equipment, inventory, supplies and business there conducted. Foodway was not required to hire Allied's employees at this store. All three former managerial employees at the Montana Avenue store, however, went on Foodway's payroll on September 4 without any lapse of employment. On September 21, 1971 Foodway reopened the Montana Avenue store conducting the same business as Allied, on the same premises, with substantially the same equipment, although with some unremarkable physical changes.

After the closing of the Montana Avenue store on August 28, thirteen of the seventeen rank-and-file employees attempted to obtain employment with Foodway but were unsuccessful. Two other employees did not apply because they learned that it would be futile to do so. Foodway's Divisional Manager refused to hire any of the Montana Avenue store's former non-supervisory employees, but instead hired all new employees, many of whom were inexperienced and had to be trained. Foodway paid generally lower wages to the rank-and-file employees than the scale had been under the Union's contract with Allied.

The Union attempted to persuade Foodway to recognize and abide by the agreement between Allied and the Union. Foodway countered by offering to pay the Union $1,200 at first and finally $2,500 if the Union would bow out. The Union declined and subsequently filed unfair labor practice charges against Foodway.

[1]. Retail Clerks International Association, Local 663 AFL–CIO.

Foodway first insists that the Montana Avenue store does not constitute an appropriate unit because the collective bargaining agreement between Allied and the Union was a multi-employer contract. We fail to grasp the significance of this argument since the agreement contained separate . recognition clauses and Allied recognized the Union separately as the representative of its employees at the Montana Avenue store.[2] *Cf.* Emerald Maintenance, Inc. v. N.L.R.B., 5 Cir. 1972, 464 F.2d 698. Moreover, Foodway introduced no evidence to demonstrate that the unit described in the collective bargaining agreement was inappropriate, but instead relied on the legal argument made here. In the circumstances of this case we find no misuse of the Board's broad discretion in determining that the Montana Avenue store employees (with the exceptions mentioned in note 2, *supra*), continued to constitute a unit appropriate for collective bargaining purposes. "We must keep in mind that the Board's unit determination, based on its analysis of the particular set of facts before it, 'should not be set aside unless the reviewing court finds that the Board has exercised its discretion in an arbitrary or capricious manner.'" N.L.R.B. v. Baton Rouge Waterworks Co., 5 Cir. 1969, 417 F.2d 1065, 1067, *citing* Spartans Industries, Inc. v. N.L.R.B., 5 Cir. 1969, 406 F.2d 1002, 1005.

Foodway next argues that substantial evidence on the record as a whole fails to support the Board's finding that Foodway violated Section 8(a)(3) and (1) of the Act by refusing to hire Allied's former Montana Avenue employees because of their union membership. It points out that this store was losing money before the takeover; that none of the former employees were told that they were not going to be hired because they were union members; and that the store was closed and being remodeled and therefore no jobs were available. We are unpersuaded. Foodway was aware of the Allied-Union contract before it formally purchased the store. In contrast to the complete turnover of rank-and-file employees at the Montana Avenue store, non-union rank-and-file employees at the other two stores were hired *in toto*. Inexperienced workers were hired to replace experienced workers despite one worker's offer to take a wage cut. The Montana Avenue store's employees were denied consideration even for jobs in the other two stores. We give little credence to the reason assigned—the loss of money—for the refusal to hire any of the non-supervisory employees. Reason dictates that the managerial employees, who were retained, not the rank-and-file employees who were fired, should be responsible for failing to take the necessary measures to eradicate the cause of the losses. The First Circuit was faced with a similar situation in N.L.R.B. v. New England Tank Industries, Inc., 1 Cir. 1962, 302 F.2d 273. There the employer contended that its decision not to hire its predecessor's employees stemmed from unexplained gasoline losses which had occurred on the pipeline prior to takeover. Finding that such action violated the Act, the court said:

> Despite the presence of a pool of experienced workers, respondent went to considerable length to replace the union employees with entirely new workers—most of whom had no previous experience on pipeline operations. . . . [W]e note that all of respondent's far flung affiliates function as "non-union" operations. Taken in context, we believe that it can be fairly said that if not the only reason, the substantial or motivating reason

2. The recognition clause applicable to Allied recognized the Union as the exclusive bargaining representative in a unit of "all of the Employer's regular full-time and regular part-time employees, who are employed in the Employer's retail store at 6373 Montana Ave., in El Paso County, Texas, excluding Co-manager, Manager in Training, Store Accounting Administrator, Meat Department employees, guards, watchmen and supervisors as defined in the Act, as amended."

for the respondent's refusal to hire the former employees resided in the fact that the employees were members of the union.

*Id*. at 276–277. *See also* N.L.R.B. v. Burns International Security Services, Inc., 1972, 406 U.S. 272, 280–281 n. 5, 92 S.Ct. 1571, 32 L.Ed.2d 61; K. B. & J. Young's Super Markets, Inc. v. N.L.R.B., 9 Cir. 1967, 377 F.2d 463, cert. denied, 389 U.S. 841, 88 S.Ct. 71, 19 L.Ed.2d 105.

We are satisfied from the record before us that the refusal of Foodway to hire the employees of Allied at the Montana Avenue store was because of their membership in the Union and that this was an attempt to avoid the obligations of a successor employer.

Foodway next contends that substantial evidence fails to show that the Union represented a majority of the employees and that it was therefore under no duty to bargain with the Union. It is manifest that but for Foodway's discriminatory refusal to offer employment to Allied's unit employees, the Union would have continued to enjoy a majority representative status. We decline to permit an employer to rely upon its own wrongdoing and thus avoid its legal responsibilities. *See Burns, supra*, at 280, n. 5. Furthermore, we are not impressed with Foodway's argument that the new employees hired by Foodway were not members of the old bargaining unit. The composition of the unit is not the controlling factor in determining successorship, otherwise "a purchaser might well seek to avoid application of the successorship principle by refusing to hire the seller's employees." International Ass'n of Machinists, Dist. Lodge 94 v. N.L.R.B., 1969, 134 U.S.App.D.C. 239, 414 F.2d 1135, 1138 (footnote omitted).

Foodway insists, however, that it cannot be found to be a successor employer of Allied. In N.L.R.B. v. Zayre Corp., 5 Cir. 1970, 424 F.2d 1159, 1162, we considered the successorship doctrine:

> The acquiring employer is the successor to the obligations of his predecessor if there is continuity in the business operation. "The crucial question in determining if the certification is binding on the successor employer is whether the employing industry remains essentially the same after the transfer of ownership." NLRB v. Auto Ventshade, Inc., 5 Cir. 1960, 276 F.2d 303, 304; NLRB v. Valleydale Packers, Inc., 5 Cir. 1968, 402 F.2d 768.

Conceding that "a cursory examination of the record would indicate . . . that the employing industry remained the same," Foodway has suggested twenty-four factors to support its contention that this is not a successorship case.[3] In our view the factors considered singly and collectively are insufficient to overcome the substantial evidence supporting the conclusion that Foodway refused to hire any of the Allied employees in order to avoid recognizing and bargaining with the Union.

Finally, we reject the argument by Foodway that it is not a successor employer since the Union had not been recently certified. While the *Burns* Court was concerned with a situation in which the union had been recently certified, there is nothing to suggest that recent certification is a condition precedent to application of the successorship doctrine. In fact, the Court cited with approval cases in which a bargaining obligation was found even though the union had not been recently certified or had not been certified at all. *Burns, supra*, at 281. *See also* our holding in *Emerald Maintenance, supra*, decided after *Burns*.

We approve the finding of successorship and the issuance of a bargaining order.

Enforced.

3. See Appendix.

## APPENDIX

Foodway argues that the following factors remove this case from the successorship doctrine:

(1) The agreement to purchase the two non-union K–Mart stores was entirely separate and entered into at a different time from the agreement to purchase the Montana Avenue-Globe store; (2) The Montana Avenue store was under a multi-employer collective bargaining contract, with a multi-employer unit; (3) Respondent took over and began operating the two K–Mart stores the day following the time Allied ceased to operate the two stores and began operating them without a break in service or operation; (4) The Montana Avenue store was closed by Allied and all non-managerial employees were dismissed by Allied on August 28, 1971; (5) It was not until August 31 that the Respondent was able to reach an agreement with the Globe officials in Chicago as to changing the name and purchasing the Montana Avenue store; Respondent did not become involved in any way with the Montana Avenue store until September 4; (7) The managerial personnel retained by Allied at the Montana Avenue store were hired by Respondent only after they had first made application with Respondent and in fact were unaware of Respondent's purchase of the store until September 4, at the earliest; (8) The Montana Avenue store was completely closed to the public between August 28 and September 21; (9) During this period Respondent remodeled and repainted portions of the store, changed the store name and sign, made extensive changes in shelving, shifted merchandise to new locations, installed a different loading and unloading system, installed new equipment, and restocked the store with its own merchandise, and increased the hours the store was to be open to the public; (10) There was no agreement in the sales agreement as to the Montana Avenue store requiring Respondent to offer employment to the former Allied employees; (11) There were in fact no employees for Respondent to offer employment to at the time Respondent took over the Allied store on September 4; (12) Respondent had a six day week that the store was open while Allied was open seven days a week; (13) Respondent had different employee classifications from Allied, including no co-manager, no manager trainee, no accounting clerk, no head clerk, no heavy duty clerk, no light duty clerk; (14) Respondent specialized in the sale of private label merchandise, while Allied sold more brand names; (15) Rudy Villalobos, Allied's manager of the Montana Avenue store, and Respondent's first manager of the store, terminated his employment with Respondent on January 8, 1972, because he "just couldn't take the change" between Respondent's methods and those of Allied; (16) There was a substantial increase in "paperwork" with Respondent over what Allied had required; (17) Respondent's wage rates were different from those of Allied; (18) Advertising by Respondent was materially different from that of Allied; (19) There was a change in customers following Respondent's take-over of the store; (20) Because of the amount of time the Montana Avenue store was closed to the public following Respondent's purchase, there was a resultant loss in business and reduction in customers, some of which could not be recaptured; (21) The extended period during which the store was closed for revamping is not normal in the food store business following a sale of a store; (22) The fact that the Montana Avenue store had been losing money under Allied's operation prior to August 28 was uncontroverted; (23) Under Respondent's operation the store immediately began to show a profit, indicative of a material change in operations, industrial organization and system; and (24) There is no business connection between Allied and Respondent as to the retail food business.