**AIR EXPRESS INTERNATIONAL CORPORATION, Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

No. 79–3776.

United States Court of Appeals, Fifth Circuit.* Unit B

Oct. 19, 1981.

---

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Guggenheimer & Untermyer, Jerold D. Jacobson, Fred Kolikoff, New York City, for petitioner-cross respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, Diana Orantes Ceresi, NLRB, Washington, D. C., for respondent-cross petitioner.

Before GODBOLD, Chief Judge, MORGAN and HENDERSON, Circuit Judges.

GODBOLD, Chief Judge:

Air Express International ("AEI") seeks to set aside the Board's order entered against it, and the Board seeks enforcement.

AEI is engaged in the business of air freight forwarding. Until February 9, 1978 its plant serving Atlanta's airport was located in East Point, Georgia. February 10, 1978 AEI acquired nationwide all of Trans-Air Freight System, Inc.'s ("Trans-Air") air freight forwarding business and moved its own Atlanta operation to Trans-Air's Atlanta facility located seven to 10 miles away in contiguous College Park, Georgia, consolidating the two Atlanta operations.

Just two months prior to this move Truckdrivers and Helpers Local Union No. 728 ("the union") was certified as the collective bargaining representative for the nonsales personnel at AEI's East Point facility.[1] Trans-Air's College Park facility was not unionized.

This controversy centers on AEI's decision to transfer only three of its East Point nonsales personnel to the new College Park facility, thereby discharging five members of the East Point bargaining unit, and AEI's refusal to recognize the union as the representative of the College Park employees. Also at issue is the discharge of a sixth East Point employee prior to the move, the alleged failure of AEI to bargain in good faith with the union over the effects of the move, and AEI's alleged acts of interrogation, threats of reprisal, promises of benefit, solicitation of employees not to engage in union activity or to give testimony to the Board, and creation of the impression of surveillance. An administrative law judge ("ALJ") found against AEI on virtually all charges and recommended that AEI be ordered to cease and desist from the various violations of §§ 8(a)(1), (3), and (5) of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 158(a)(1), (3) and (5), that he had found, to offer reinstatement and back pay to the six discharged East Point employees, and to post the usual notice. The Board affirmed the ALJ's findings in all particulars except one,[2] adopted the recommended order (with minor variations), and rejected AEI's contention that it had been prejudiced by any bias of the ALJ.

## I.

We focus first on the discharged employees. AEI contends that the five East Point employees who were not transferred to the new College Park facility were terminated[3] because it was decided as a business matter that the company needed to break up one of the employee groups and the employees of the less profitable operation should be let go with the hope that Trans-Air's more profitable customers

---

1. The election was held July 28, 1977, with a 5–1 vote for the union. The Board certified the union on December 14, 1977. Guards, supervisors, and confidential and professional (i. e., sales) employees were excluded from the bargaining unit.

2. The Board ruled that Trans-Air's station manager at College Park was not acting for AEI when he made threats of reprisal prior to consummation of AEI's acquisition of Trans-Air. We agree with this ruling. As the Board discerned, the ALJ's conclusion to the contrary was based solely on speculation.

3. Some controversy surrounds whether John Moore, one of these five, was in fact terminated. Moore was offered a position at the new plant but only as a supervisor. Moore had previously turned down a supervisor's position at East Point because it lacked the security of tenure that his rank-and-file position possessed. He again refused a supervisor's position at College Park, and thus was terminated for a time, although he did recant and agree one month later to come back on as a supervisor. The fact that Moore was offered another position does not ameliorate AEI's discriminatory refusal to retain Moore at his current position because Moore considered the new position less desirable and because the Board found upon substantial evidence that AEI, in offering Moore only a supervisor's position, was motivated by a desire to lessen the number of rank-and-file union supporters at College Park.

would be retained.[4] Thus AEI argues that it had no illegal motive, or if there were such a motive that it would have made the same decision regardless. The Board found to the contrary. Its decision is based on substantial evidence. First, there is direct testimony by a former AEI sales employee that Frank O'Rorke, AEI's district manager stationed at East Point, told her over a series of conversations that the company was not going to allow the union in Atlanta, that it was going to get rid of the employees who voted for the union, and that "those guys . . . cut their throats" by bringing in the union. Second, circumstances speak as loudly as these words. Of the three East Point employees retained after the move one was the station manager, one was a vocal anti-union advocate, and the third was the replacement for Nella Ree Dunn, the employee who had been discharged prior to the move. By contrast, the five employees not transferred included all of the acknowledged union organizers and supporters at the East Point facility. Elsewhere in the country when AEI consolidated its operations with Trans-Air's not a single AEI employee was discharged except for two part-time workers. We have no difficulty in holding that the Board correctly found that these terminations violated § 8(a)(3) of the Act and in enforcing the orders of reinstatement and back pay.

██ We also enforce the Board's decision as it relates to Nella Ree Dunn. Dunn was secretary to district manager Frank O'Rorke. She was fired July 11, 1977, two and one-half weeks before the election, because O'Rorke suspected her of being the source of leaks of salary information that were causing dissension among the employees. Later, O'Rorke asserted as additional grounds for Dunn's dismissal her incompe-

tence and slow business. The Board found these reasons to be disingenuous. There was no direct evidence that Dunn was responsible for the leaks, they took place well before Dunn's discharge, and salary information was commonly known and was not as a general rule kept in confidence. The later asserted grounds were found to be pretextual. Thus, the Board concluded that the real reason for Dunn's discharge was that O'Rorke suspected her of supporting the union. The evidence is substantial.

██ In its reply brief AEI raises for the first time the argument that Dunn is not protected by the Act because she is a confidential secretary. Without deciding the validity of this legal contention,[5] we hold that the ALJ correctly found Dunn not to be a confidential secretary. O'Rorke testified that June 8, the day he received the union's election petition, all confidential duties that Dunn might have had were withdrawn from her. Thus, at the time of her discharge one month later Dunn's position was admittedly non-confidential.

## II.

AEI hotly contests the order directing it to bargain with the union at its College Park facility. The Board based this order on two alternative grounds: first, that the certification obtained December 14, 1977 at the East Point facility covered the College Park employees once AEI transferred its operations there February 10, 1978; second, that a *Gissel*[6] order was warranted because of the severity of AEI's illegal opposition to the union.

██ A *Gissel* bargaining order is typically invoked when a union that has only informal evidence of majority status is re-

---

4. AEI's contention that it was motivated by the East Point employees' refusal 10 months earlier to comply with changes in their shifts patently lacks merit. Only one employee actually refused a shift change, and only one other was opposed to the changes. Moreover, at the time of opposition to the changes no employee was disciplined or reprimanded in any way except for the station manager who was fired for giving in to the one worker's protest.

5. The U. S. Supreme Court has granted certiorari in a case that presents this issue. *Hendricks County Rural Electric Membership Corp. v. NLRB*, 627 F.2d 766, 771–76 (7th Cir. 1980), *cert. granted*, 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 612 (1981).

6. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

fused recognition; the order issues because a formal election either fails or is likely to fail because of the company's commission of unfair labor practices. Bargaining orders are also appropriate where recognition is withdrawn from a union that has been formally certified as the representative of a bargaining unit. *See Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35, 46–48 (D.C.Cir. 1980) (discussing the distinction). Certification carries with it an entitlement to one year's presumptive majority status, a presumption irrebuttable absent "unusual circumstances." *Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); *NLRB v. Auto Ventshade, Inc.*, 276 F.2d 303 (5th Cir. 1960). If an employer fails to honor properly a union's certification, then a non-*Gissel* bargaining order may issue to enforce the certification. *See e. g., NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 278–81, 92 S.Ct. 1571, 1577–79, 32 L.Ed.2d 61 (1972); *NLRB v. Louisiana Bunkers, Inc.*, 409 F.2d 1295 (5th Cir. 1969). If the East Point certification extends to the College Park facility, then this is a withdrawal of recognition (non-*Gissel*) case. If not, then College Park is uncertified and we have a refusal of recognition (*Gissel*) case.

A union certification applies to the intangible construct known in labor parlance as a "bargaining unit" (or simply "unit"). A unit enjoys the ephemeral attributes of not being rigidly defined by any fixed location, size, or composition of personnel. Thus, the relocation of a unit, an increase or decrease in the size of a unit, or a complete turnover within a unit alone does not require a finding that a once-certified unit has ceased to exist. *See Louisiana Bunkers, Inc.*, 409 F.2d at 1298–99 (relocation); *NLRB v. King Radio Corp.*, 510 F.2d 1154, 1156–57 (10th Cir.), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975) (increase); *NLRB v. Middleboro Fire Apparatus, Inc.*, 590 F.2d 4, 8 (1st Cir. 1978) (decrease); *NLRB v. Leatherwood Drilling Co.*, 513 F.2d 270, 273 (5th Cir. 1970), *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975) (turnover). But as with other metaphysical categories, these mutations by degree, if severe enough, shade into mutations by kind, and may result in eradication of a unit. In such cases, where changes in the characteristics of a unit result in its being classified as either a different unit or a nonunit, "unusual circumstances" have occurred so that a company is justified in withdrawing recognition from a union during the first year of certification. *See Brooks v. NLRB*, 348 U.S. at 98–99, 75 S.Ct. at 178 (unusual circumstances include radical fluctuation of unit size in a short time). The courts give a wide degree of discretion to the Board in its determinations of the composition and definition of units. *E. g., Vicksburg Hospital, Inc. v. NLRB*, 653 F.2d 1070 at 1074–75 (5th Cir. 1981); *NLRB v. Foodway*, 496 F.2d 117, 119 (5th Cir. 1974) (arbitrary and capricious standard); *NLRB v. Baton Rouge Water Works*, 417 F.2d 1065 (5th Cir. 1969) (same).

With these principles in mind, we examine the facts to determine whether the College Park unit is a continuation of the East Point unit. AEI first contends that certification does not extend to College Park because a single-plant unit is no longer appropriate as a result of AEI's reorganization of its southeastern district. The Atlanta facility once comprised a single-plant district, but upon acquisition of Trans-Air AEI's southeastern district was restructured to include Atlanta and Charlotte. AEI contends that the Board may now only aggregate the employees at the Atlanta and Charlotte facilities into one unit rather than maintaining two separate units because labor management policy is formed only at this expanded district level. We do not agree. Restructuring AEI's regions is not the kind of change that amounts to an "unusual circumstance." To hold otherwise would allow any company to avoid a certification simply by shifting its management.

AEI next contends that as the result of the relocation of its East Point facility and its consolidation with the former Trans-Air facility, the College Park plant is a "new operation" and therefore not within the

East Point certification. AEI argues that because 85% of its East Point business was international air freight whereas 85% of Trans-Air's business was domestic, upon merger of the two a new amalgam was formed. The company also points to the fact that the new facility is seven to 10 miles away on the opposite side of the airport and that its staff has doubled. Other facts support the Board's conclusion. AEI at its College Park facility continues to service only the Atlanta airport, it remains only in the air freight forwarding business, and but for its discriminatory termination of six employees a substantial percentage of its College Park employee complement would consist of former East Point workers.

The authorities cited by AEI are sufficiently distinguishable on their facts that the Board is not being arbitrary or illogical in declining to follow them here. In *General al Electric Co.*, 170 NLRB 1272 (1968), the Board found that the consolidation of two plants created a new operation under facts similar to those here: the new plant was 10 miles away and the product lines of the two old plants were similar. The critical factor, though, and the one that the Board focused on, was that only half of the employees in question at the old plant that was unionized transferred to the new facility. Similarly, in *Electronic Products International Corp.*, 208 NLRB 350 (1974), the Board found that a relocated plant was a separate unit, but only two of the seven employees at the old plant accepted transfers, and they both quit within 30 days of the move. By contrast, here, as discussed below in this section of the opinion, it is presumed that all of the employees in the East Point bargaining unit would transfer.

Bearing in mind the deference we give to the Board in the question of the composition of a bargaining unit, we hold that the Board did not err in its unit determination in this matter. *NLRB v. Baton Rouge Water Works*, 417 F.2d 1065 (5th Cir. 1969) is analogous. There the Board held that a small rural water company acquired by Baton Rouge Water Works was an "accretion" to the Baton Rouge bargaining unit and thus was covered by union certification at Baton Rouge. We enforced the bargaining order even though the second facility was nine miles away, serviced rural customers rather than urban, had a separate day-to-day management, and was a separate legal entity. *See also NLRB v. Foodway*, 496 F.2d 117 (5th Cir. 1974) (acquiring company succeeds to duty to recognize existing union despite 24 distinguishing factors); *Vernon Calhoun Packing Co., Inc.*, 173 NLRB No. 112 (1968), *enforced without opinion*, 436 F.2d 588 (5th Cir. 1971) (second plant is an accretion).

So far we have pretermitted the issue of whether former East Point employees comprise a majority of the College Park bargaining unit. Employee composition at the new facility is usually the most critical factor in characterizing a relocated or merged unit. The Board found after lengthy analysis that the bargaining unit at College Park consisted of 10 employees, and that if AEI had not discriminatorily discharged six of its East Point employees, then seven [7] of these 10 would be former members of the East Point bargaining unit. AEI counters that no majority exists because three College Park employees found to be supervisors are actually rank-and-file and there is no evidence that the six employees not transferred would in fact have moved if given the opportunity.

The Board's initial characterization of three of Trans-Air's former employees as supervisors was based on substantial evidence. There is testimony that two of these three had authority to hire or fire employees and all three exercised independent judgment in directing other workers. Each was in charge of the facility during his or her shift. This satisfies the Act's definition of supervisor. *See NLRB v. Alamo Express, Inc.*, 430 F.2d 1032 (5th Cir. 1970), *cert. denied*, 400 U.S. 1021, 91 S.Ct.

---

7. The seventh is Kathy Lee, the anti-union employee who was transferred.

584, 27 L.Ed.2d 633 (1971). The Board erred, however, in confining its inquiry to what the duties of these three were on the day of the move. Shortly after the move one of these three, Susan Doyle, was reclassified to "lead agent," allegedly because it was felt that there were too many supervisors.[8] In assessing the effects of a relocation or merger of a bargaining unit, a reasonable "shake down" period may be required in order for the new unit to stabilize. *Cf. NLRB v. Houston Distribution Services, Inc.*, 573 F.2d 260, 266 & n.7 (5th Cir. 1978), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 705 (1979) (accord where issue is successorship of acquiring company). The Board failed to allow for the possibility that Doyle's reclassification was part of such stabilization. If Doyle's status were critical to our decision, we should remand for further consideration. Our assessment of the composition of the bargaining unit does not change according to her status, however, and so we simply vacate the Board's decision as to Doyle and assume *arguendo* that she is not a supervisor.

■ We are left then with a bargaining unit of 11, composed of a majority of seven former East Point employees. AEI argues though that there is no evidence that the six discharged employees would have accepted a transfer to College Park if they had been given such an opportunity, citing *Fraser & Johnston Co. v. NLRB*, 469 F.2d 1259, 1264 (9th Cir. 1972) and *Cooper Thermometer Co. v. NLRB*, 376 F.2d 684, 689 (2d Cir. 1967). In the circumstances of this case, however, the Board is not required to affirmatively demonstrate that each discharged employee would have transferred absent his or her illegal termination. The

Board may rely on the presumption that discriminatorily discharged employees remain on with the company. *See NLRB v. Fabsteel Co.*, 587 F.2d 689, 695 (5th Cir.), *cert. denied*, 442 U.S. 943, 99 S.Ct. 2887, 61 L.Ed.2d 313 (1979); *NLRB v. Houston Distribution Services, Inc.*, 573 F.2d 260, 267 (5th Cir. 1978), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 705 (1979). The policy that gives rise to this presumption of continued employment is that a violator of the Act should not be allowed to benefit from its wrongdoing by placing the difficult burden on the Board of proving how individual employees might have acted under hypothetical circumstances. *NLRB v. A. W. Thompson, Inc.*, 449 F.2d 1333, 1337 (5th Cir. 1971), *cert. denied*, 405 U.S. 1065, 92 S.Ct. 1497, 31 L.Ed.2d 795 (1972).

The critical factor that distinguishes this case from those cited by AEI is that here the failure to transfer the employees in question was itself a violation of the Act. For example, in both *Cooper Thermometer v. NLRB*, 376 F.2d 684 (2d Cir. 1967) and *Fraser v. Johnston*, 469 F.2d 1259 (9th Cir. 1972), the courts refused bargaining orders because there had been no affirmative showing that a majority of employees at a relocated plant came from the old unionized plant, even though the relocation was accompanied by unfair labor practices. In both cases, however, the labor violations did not involve unlawful terminations but merely failure to bargain over the effects of the relocation. Without adopting the reasoning of these cases, we note that there is much less reason in such cases to presume that employees who did not transfer would have done so absent the particular violations.[9]

---

**8.** In addition to these three contested supervisors there were three other employees with the title of supervisor.

**9.** We note also that the presumption might not arise where a plant is relocated to an entirely different metropolitan area. For example, in *Local 57, International Ladies' Garment Workers v. NLRB*, 374 F.2d 295 (D.C.Cir.1967), *cert. denied*, 395 U.S. 980, 89 S.Ct. 2129, 23 L.Ed.2d

767 (1969), the court held that a bargaining order would not issue where a plant was moved to Miami from New York, but the court observed that this remedy has been used "where the move was of such a short distance that the Board could assume that, absent the unfair labor practices, workers would have followed the employer to the new site." *Id.* at 303.

■ Relying on this presumption, we find there is substantial evidence to support the finding that the six discharged employees would have transferred to College Park absent their discharge, particularly since AEI has failed to develop any evidence to the contrary.[10] We hold, then, that the Board's determination of the size and composition of the College Park bargaining unit, although possibly flawed in one respect, is correct so far as is necessary for us to affirm the finding of continuation.

To summarize our reasoning with regard to the Board's bargaining order, in this case a certified bargaining unit has been merged *and* relocated and employees have been discriminatorily discharged in the process. Because the move was over a relatively short distance the Board could presume that the discharged employees would have transferred but for their termination, and that presumption has not been rebutted. We thus view the College Park bargaining unit as being composed of a majority of workers from the East Point plant, and this fact along with others adequately supports the Board's conclusion that College Park is a continuation of East Point.[11] Because the union has not enjoyed its full year of certification, we enforce the Board's bargaining order (as modified below). We need not address whether a *Gissel* order would be appropriate in this case.

**10.** In a *Gissel* order case majority status is to be determined at the time the order issues. *NLRB v. American Cable Systems, Inc.*, 427 F.2d 446 (5th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970). In this non-*Gissel* case, however, the composition of the bargaining unit is to be determined at the time of the relocation (or after a reasonable shake down period). Otherwise, the rule would be contrary to principles of fair play, *see NLRB v. Auto Ventshade, Inc.*, 276 F.2d 303, 307 (5th Cir. 1960), and would create an undesirable incentive to delay through litigation. The difference exists between the two rules because in a *Gissel* case the issue is whether an extraordinary remedy is warranted while in this non-*Gissel* case the issue is simply whether the certification is to be given continued effect.

**11.** We note that a majority of former workers at a new facility is not necessary to find a continuation of a bargaining unit after merger and relocation if other factors strongly support

### III.

We come now to the findings of the Board that AEI was in violation of § 8(a)(5) for failing to bargain in good faith over the effects of the relocation.

■ The union and AEI met on three occasions to discuss the effects of the move. The Board found upon substantial evidence that at these meetings AEI improperly refused to supply the union a copy of its acquisition agreement with Trans-Air, that AEI's list of Trans-Air personnel given to the union was somewhat incomplete and inaccurate, and that AEI misrepresented its position by stating that it intended to terminate all East Point employees when in fact it intended to transfer Kathy Lee. We hold that these findings support the Board's order insofar as AEI is required to furnish to the union complete employee information and a copy of the acquisition agreement and is required to bargain in good faith in the future. The Board erred, however, in using the date of AEI's first failure to bargain in complete good faith (January 4, 1978) as the measure of the date to which its bargaining order was to be retroactive. The violations of § 8(a)(5) outlined above do not amount to a withdrawal of recognition. It was not until February 11, 1978, one day after the move, that AEI refused to recognize the union as the representative of its College Park plant. This date should measure the bargaining order because the union

this conclusion, *see Westwood Import Co.*, 251 NLRB No. 162 (1980) (the Board's practice in relocation cases accompanied by unfair labor practices has been that if "a majority or *some significant portion* of the unit employees at the new location" would have been from the old location but for such practices, then a bargaining order has issued) (emphasis added), nor would a majority be sufficient if these other factors were lacking, for instance if the business of the new plant were entirely different from that of the former. In each situation the issue remains whether in the light of all the facts the bargaining unit remains the "same" or is now a "different" one. We note also that whereas in simple relocation cases the Board has treated the employee composition factor as the determinative one, *see Westwood*, where a relocation is coupled with a merger and thus somewhat altered operations and structure, as here, the inquiry is more complex.

enjoyed effective recognition from December 14 when it was certified until February 11. We therefore vacate the Board's bargaining order and remand with directions to modify the order so as to allow the union to enjoy certified representative status only for the remainder of its certified year.[12]

### IV.

We enforce the Board's order as relevant to the remainder of miscellaneous violations of the Act. Based on substantial evidence, the Board found that AEI discriminatorily threatened to withhold raises from some employees while granting and promising raises to others all in order to discourage union activity and weaken the pro-union majority, that AEI threatened employees with various other reprisals because of their support of the union, and that AEI created the impression of surveillance and otherwise interfered with the freedom of employee's union activities by interrogating employees about such activities, by warning of "harassment" from Board agents, and by soliciting employees not to testify before the Board.

Finally, we agree with the Board that there is not evidence of bias sufficient to reject the ALJ's findings.

ENFORCED in part, VACATED in part, and REMANDED in part with directions to modify.

---

12. Thereafter, of course, the certification will remain in effect but subject to rebuttal or good faith doubt.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.