Robert H. WATSON, Acting Regional Director of Region 26 of the National Labor Relations Board, for and on Behalf of the National Labor Relations Board, Petitioner,

v.

MOELLER RUBBER PRODUCTS, INC., Respondent.

No. 4:92CV017–D–O.

United States District Court, N.D. Mississippi, Greenville Division.

April 30, 1992.

Margaret Guill Brakebusch, Memphis, Tenn., for Acting Regional Director for the National Labor Relations Bd., Region 26.

Glen Marshall Connor, pro hac vice, Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, Ala., for Charging Party: United Steelworkers of America, AFL–CIO/CLC.

Jerrald L. Shivers, Fuselier, Ott, McKee & Shivers, Jackson, Miss., for respondent.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

This matter is before the court upon petitioner's request for injunctive relief under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), pending final disposition of the case before the National Labor Relations Board (Board). The peti-

tioner seeks an order directing the respondent to cease and desist from failing to recognize and bargain with the United Steelworkers of America, AFL–CIO, CLC ("the Union"), as the exclusive bargaining representative for respondent's employees at its Greenville, Mississippi facility. The court held an evidentiary hearing on the motion on March 6, 1992, after which the parties submitted post-hearing briefs. The parties have stipulated that the court may take into consideration the evidentiary record which was developed at a hearing before an Administrative Law Judge on February 26, 1992. Having considered this record as well as the briefs, arguments and exhibits of the parties, the court has decided to grant the requested relief in part and deny it in part. The factual background and authority for the court's decision are set forth below.

## STATEMENT OF FACTS

The instant dispute arose after a three-part entity known as the Moeller Manufacturing Company, Inc. ("MMCI") separated and sold a portion of its assets. For all intents and purposes, MMCI is the original umbrella corporation from which all other entities relevant to this opinion directly or indirectly emanate.[1] Since July 8, 1969, the exclusive collective bargaining representative for production and maintenance employees at this umbrella entity has been the United Steelworkers of America, AFL–CIO, CLC ("the Union"). The parent company for this original umbrella entity was the Moore Company.

Up until about September 1, 1990, the actual production process at MMCI was divided into three areas of production or three plants—automotive products, rubber products and marine products.[2] The plants produced automotive and marine products, which consisted of metal and rubber component parts that were assembled together. All of the rubber components were produced in-house through the rubber products plant, so that the rubber division did not actively market rubber products to outside customers.[3] The automotive plant and rubber products plants were located approximately a hundred yards from each other on Thornton Street, while the marine facility, "Moeller Marine," was located a quarter of a mile away.[4] Uniform policies for the plants were dictated by MMCI, and its parent, the Moore Company. Up until July 1991, a total of 140 employees worked in these plants and had opportunities to be transferred or promoted from one division or plant to another within the Greenville operation of MMCI. The employees of all three plants were included as a single bargaining unit, with a single collective bargaining agreement which initially covered a period of time from October 1, 1988 through July 14, 1991. MMCI and the Union amended the collective bargaining agreement on July 15, 1991 to extend its coverage through October 15, 1991.

On July 10, 1991, MMCI sold the facilities of the automotive division and the rubber products division to Washington County and sold almost all of the equipment assets and production assets of these two plants to an organization called the Breckenridge Group.[5] Washington County then leased back the facilities to the new owner. This new entity consisting of the automotive and rubber product production became known as "Moeller Products, Company,

---

**1.** Because so many of the later organizations use the name "Moeller" in some form, the transactions are somewhat confusing, although not seriously disputed. What is disputed is the effect these transactions have had on the respondent's duty, if any, to recognize and bargain with the Union.

**2.** Transcript of Proceedings Before the National Labor Relations Board, Region 26, p. 25–27 (Testimony of Ron Brock) [hereinafter Transcript].

**3.** *Id.* at 145–46 (Testimony of Ron Brock).

**4.** *Id.* at pp. 27–28 (Testimony of Ron Brock).

**5.** *Id.* at 30 (Testimony of Ron Brock); Respondent's Reply Memorandum in Opposition to Petition for Temporary Injunction, p. 3. Although this sale took place before the amendment to the Collective Bargaining Agreement on July 15, 1991, it is undisputed that the successor to these assets recognized and was prepared to bargain with the Union. *See* Transcript, at pp. 35 & 38 (Testimony of Ron Brock).

Inc.," (Moeller Products/Automotive).[6] The sale of the automotive and rubber product facilities and assets left the original umbrella entity, MMCI, with only the marine facility, which was not sold and which changed its name to "Moeller Marine Products" (Moeller Marine).[7] For a time, Moeller Marine produced its own rubber parts, but soon announced that it would no longer produce such parts and instead obtain them from outside sources. The company that began to supply needed rubber parts to Moeller Marine, as well as to other customers, "Moeller Rubber Products, Inc.," (Moeller Rubber), is the respondent in this petition. Its refusal to recognize and bargain with the union is the focus of this dispute.

Respondent asserts that Moeller Rubber was formed by "a group in Greenville separate and unrelated to Moeller Manufacturing, Moeller Marine, the Moore Company or Moeller Products/Automotive."[8] A bill of sale between Moeller Products/Automotive and Moeller Rubber shows that Moeller Rubber acquired certain rubber assets from Moeller Products/Automotive presumably to fill a void created by the decision by Moeller Marine to terminate production of rubber component parts and to terminate employees that had been associated with those jobs. But a letter dated September 12, 1991 from Ron Brock, the president and general manager of the respondent company, to the staff representative of the United Steelworkers more directly links the Moeller Rubber acquisition to the old MMCI rubber plant. Written to inform the Union that Moeller Rubber would not assume the bargaining agreement, the letter states:

On September 12, 1991, Moeller Rubber Products, Inc., will acquire the Moeller Manufacturing Company, Inc., Rubber Division Plant in Greenville, Mississippi pursuant to its purchase of certain assets of Moeller Manufacturing Company, Inc., and Moeller Products Company, Inc. This letter is to advise you that Moeller Rubber Products has not and will not assume the existing collective bargaining agreement in effect between the United Steelworkers of America and Moeller Manufacturing Company, Inc., for this plant and does not intend to be bound by that agreement.

Moeller Rubber Products will set initial terms and conditions of employment to be offered to its employees at the plant. Existing employees will be afforded the opportunity to apply for employment with Moeller Rubber Products and to determine for themselves whether or not they wish to accept employment under such new terms and conditions ... [9]

Consequently, a major issue before the Board is whether Moeller Rubber did step in as an independent entity or simply acquired the former rubber division plant of MMCI without interruption or substantial change.

A list of forty-two employees who were offered a position at Moeller Rubber shows that all but seven were formerly employed by MMCI;[10] many supervisors, including Brock, were previously supervisors with the former MMCI plants;[11] and many former workers of MMCI or Moeller Marine took positions with Moeller Rubber Products less than one day after their termination by the former company.[12] Additionally, the employees, while producing a different quantity than previously, generally

6. Respondent's Reply Memorandum in Opposition to Petition for Temporary Injunction, p. 3.

7. Transcript at p. 13 & 31 (Arguments of Respondent's Counsel & Testimony of Ron Brock).

8. *Id.* at p. 13.

9. On September 16, Union Staff Representative Rip Williamson responded to this letter with a request that Moeller Rubber recognize and bargain with the union. This request was refused in a letter from Brock dated October 8, 1991.

10. *See* General Counsel's Exhibits to Transcript; *see also* Respondent's Reply Memorandum in Opposition to Petition for Temporary Injunction, p. 5 and transcript at pp. 46–51 (testimony of Ron Brock).

11. Transcript, at p. 80 (Testimony of Ron Brock).

12. *Id.* at p. 44 & p. 114 (Testimony of Ron Brock and Testimony of Union Vice President Henry Ayers).

used the same production processes,[13] the same plant[14] and the same equipment. There has been some but not complete continuity of marketing strategy between the old and new rubber production operations; Brock explained that approximately 25 percent of respondent's finished products go to either Moeller Marine or Moeller Products/Automotive, while prior to September of 1991, 55 to 60 percent of the finished products made by the rubber products division went to the sister facilities.[15] A list of eighteen current customers of Moeller Rubber Products, Inc., shows that eleven of those customers were previously customers of MMCI.[16] Another list compiled by the Union on Union deductions in August 1991 shows that most of the nonsupervisory employees hired by Moeller Rubber from MMCI were previously members of the Union.

Brock acknowledged that workers in the automotive facility are still represented by the Union, which is in the process of bargaining for a new contract. Likewise, the Union has been consistently involved with employees at Moeller Marine since the marine facility is and always has been a part of the original parent company.[17] By contrast, Brock felt that the same did not hold true for the new Moeller Rubber entity. In his view, the new company was "twice removed" from MMCI and its parent corporation due to the separate acquisitions that took place in July and September. Additionally, Brock professed to having a good faith doubt that the employees of the new company wanted to be represented.[18]

While taking the position of not recognizing the Union, Brock maintains that an informal grievance procedure is in place at Moeller Rubber so that aggrieved employees may be heard. However, he admitted that he is the final decisionmaker with respect to such disputes and acknowledged that no Union steward is available for aggrieved employees. In the one firing decision that the new company experienced since September of 1991, the Union was notified because respondent's attorney felt that notification was the proper course given the pending dispute about representation, Brock said. However, Moeller Rubber eventually resolved the matter without terminating the employee so that further representation issues as to that particular employee did not arise.

In an effort to counter respondent's position that respondent's employees lack the desire and need for representation, petitioner produced evidence to suggest that communication between the Union and workers at Moeller Rubber is extremely difficult and that such workers are not attending Union meetings because they know their employer has taken an anti-Union stance. Petitioner's request for relief is twofold. First, petitioner seeks a temporary injunctive order requiring the respondent to recognize, meet with and bargain in good faith with the Union.[19] Second, petitioner seeks

13. *Id.* at 184 (Testimony of Ron Brock).

14. By way of a sublease agreement dated October 10, 1991, Moeller Rubber was able to sublease the facility from Moeller Products/Automotive. This sublease was entered into with the consent and approval of Washington County. *See* Respondent's Exhibits to Transcript.

15. *Id.* at pp. 147–48 (Testimony of Ron Brock).

16. *See* General Counsel's Exhibits to Transcript.

17. *Id.* at pp. 35–36.

18. In his words:
    [T]he union had an agreement with the parent company, or what remained of the parent company, and they were being recognized by the parent company's successor, and we were twice removed from the parent company, and from the general comments that I heard off of the employee floor, [I] did not believe that they had a group of people there that wanted to be represented.
    *Id.* at pp. 36–37.

19. Although petitioner's first request is actually much more lengthy, the above statement encompasses the gist of petitioner's request. Specifically, petitioner asks that the respondent be prevented from "in any other manner failing or refusing to bargain in good faith with the Union" and "in any other matter interfering with, restraining or coercing its employees ..." Petitioner's Memorandum in Support of Petition for Temporary Injunction, p. 32. The court is of the opinion that a temporary injunctive order preventing respondent's further refusal to bargain will more than suffice to satisfy all these concerns. As will be noted in the next section

an affirmative order requiring interim bargaining pending the Board's decision. As part of this second request, petitioner seeks to have the opinion and order of this court posted at respondent's plant and asks that the respondent be compelled to file an affidavit specifying how it has complied with the court's decision.

## CONCLUSIONS OF LAW

### 1. Injunctive Relief Under Section 10(j) of the National Labor Relations Act

█ Section 10(j) of the National Labor Relations Act empowers the National Labor Relations Board through its Regional Director to petition a United States District Court "for appropriate temporary relief or restraining order" against a party allegedly committing an unfair labor practice pending final disposition of such charges before the National Labor Relations Board. *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1188 (5th Cir.1975), *cert. denied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976) [hereinafter *Pilot Freight*].[20] To merit injunctive relief under Section 10(j), the Board, through its Regional Director, must show: 1) "reasonable cause" to believe that unfair labor practices have occurred; and 2) the equitable necessity of injunctive relief, i.e., that the relief is "just and proper." *Id.* (citations omitted).

In this case, petitioner alleges an unfair labor practice pursuant to Section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (5),[21] for respondent's refusal to recognize and bargain with the Union that previously represented employees at all three plants. The court will consider each of the above requirements separately.

### 2. Reasonable Cause

█ In making a Section 10(j) determination, the district court may not decide whether an unfair labor practice has actually occurred, because this ultimate determination is reserved for the board, subject to review by the court of appeals. *Asseo v. Centro Medico Del Turabo*, 900 F.2d 445, 450 (1st Cir.1990). Instead, the district court need only determine whether "reasonable cause" exists to sustain the Regional Director's determination. Only if the court is "convinced that the Board could not find unfair labor practices on the underlying charges" should a district court reject a finding of reasonable cause. *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778, 803–804 (5th Cir.1973) [hereinafter *Teamsters*].

█ The major issue facing the Board in this case is whether respondent is a successor employer within the meaning of *NLRB v. Burns International Security Services*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), such that it has a duty to recognize and bargain with the Union of the predecessor employer. In determining whether an organization is a successor employer, the Fifth Circuit has looked to the continuity of the work force, the continuity of the industry and the degree of change in the bargaining unit. *See generally Air Express International Corp. v. NLRB*, 659 F.2d 610, 614 (5th Cir.1981), *modified on other grounds*, 670 F.2d 512 (5th Cir.1982), *cert. denied*, 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982); *NLRB v. Fabsteel*, 587 F.2d 689, 692 (5th Cir.1979), *cert. denied*, 442 U.S. 943, 99 S.Ct. 2887, 61 L.Ed.2d 313 (1979); *NLRB v. Foodway of El Paso*, 496 F.2d 117, 120 (5th Cir.1974). The court finds that each of these factors supports a finding of reasonable cause in the instant

---

of this opinion, petitioner's entire proposed injunctive order is overly cumbersome and not equitably necessary.

**20.** Because the "normal NLRB machinery—involving issuance of an unfair labor practice complaint, a hearing before a trial examiner, de novo review by the Board and an enforcing order by the Court of Appeals—was so time consuming," permitting guilty parties to violate the act "with impugnity during the years of

pending litigation," Congress offered the remedy of injunctive relief to maintain the status quo in the interim. *Id.*

**21.** Sections 158(a)(1) and (5) of the Act state: "It shall be an unfair labor practice for an employer (1) to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of this title ... [and] (5) to refuse to bargain collectively with the representatives of his employees ..."

case. Respondent admits that most of its employees had formerly been employed by MMCI so that continuity of the workforce appears to be present.

Continuity of the industry, the second factor, is also arguably present when one considers that Moeller Rubber uses the same plant and most of the same machinery, equipment and methods of production as the previous rubber facility and also produces substantially the same product.[22] Respondent argues that the industry is not the same because control is now vested in a single, independent business while the previous plants all had to answer to the uniform policies and procedures of the Moore Company. An employer's existence as a separate, self-sufficient business when a previous employer was controlled by a parent company may be an important factor weighing against successorship status. See NLRB v. Alamo White Truck Service, Inc., 273 F.2d 238, 241–242 (5th Cir.1959). However, the Alamo White Truck Service case, cited by the respondent, was before the appellate court on a proceeding to enforce a National Labor Relations Board order and, thus, did not involve the reasonable cause determination the court must make here. Without determining whether Moeller Rubber was in fact a successor employer for reasons of continuation of the industry, the court finds that the Board has reasonable cause to believe that continuity of the industry exists.[23]

As to the final concern, continuity in the bargaining unit, respondent contends that there is no continuity because the bargaining unit allegedly existing at Moeller Rubber is but a fragment of the Union that existed at MMCI prior to the July, 1991

sale of assets. But one Fifth Circuit case suggests that continuity in the bargaining unit may exist even where the successor employer purchases only one of several plants previously covered by one bargaining unit. See generally Fabsteel, 587 F.2d at 694–95. Quoting from a Board determination, the Fabsteel case notes that where a union has previously enjoyed a majority status as to several plants, a presumption of "equal distribution throughout the whole unit" may carry over to each of the individual plants "[a]bsent some evidence of employee dissatisfaction or change." Id. at 694. See also id. at 695 (bargaining obligation may exist even "though the transfer in ownership results in a division of the bargaining unit into two or more units.") Brock stated that he heard from employees that they no longer desired Union representation, but countervailing circumstantial evidence was presented to indicate that employees wish to be represented but fear reprisal. While final resolution of this issue is properly left to the Board, the court finds reasonable cause to support the Regional Director's determination of continuity in the unit.[24]

### 3. Equitable Necessity

■■■ Having found reasonable cause to support the petition, the court next must consider whether the requested relief is equitably necessary. While the reasonable cause standard affords much deference to the Regional Director's determination, this second consideration confers much more discretion and responsibility upon the district court. See Pilot Freight, 515 F.2d at 1192. Among the factors various courts have considered in determining whether re-

---

22. See Premium Foods, Inc. v. NLRB, 709 F.2d 623, 627 (9th Cir.1983) (discussing the factors that should be considered in a determination of whether industry is substantially the same).

23. Respondent further argues that because Moeller Rubber now markets its product to outsiders, with a much smaller portion of its business going to the other Moeller branches, the industry is not the same, precluding successorship status. Again, this argument bears upon the merits of the underlying unfair labor practice complaint, which this court is not empowered to decide. In the instant petition for interim injunctive relief, the court must only deter-

mine that the Regional Director's position is fairly supported by the evidence, which the court so finds.

24. The court finds petitioner's final argument—that Moeller Rubber may avoid bargaining because the duty to bargain extends only to the certified bargaining representative—to be inapplicable here. This is not a situation where a local union has tried to inject itself into negotiations in place of a certified international union. See Whisper Soft Mills, Inc. v. NLRB, 754 F.2d 1381, 1385 (9th Cir.1984).

lief should be granted are the possibility of irreparable harm to the union or erosion of union support in the interim;[25] the public interest in granting the injunction;[26] the necessity for effectuating the statutory policy;[27] the flagrancy of the violation;[28] the timeliness of the Regional Director's request;[29] and the effect the injunction will have on promoting or maintaining the "status quo." *Pilot Freight,* 515 F.2d at 1193–94. Because preservation of the status quo is the primary concern underpinning a finding of equitable necessity, the court discusses this factor first.

In *Pilot Freight,* the Fifth Circuit defined "status quo" as "the last uncontested status which preceded the pending controversy." *Id.* at 1194. In that case, the district court had refused the Regional Director's request for temporary bargaining even though it agreed that reasonable cause existed to support the unfair labor practice charge. The Fifth Circuit affirmed. Finding that the status quo "was that period prior to *any* union activity," the Fifth Circuit agreed that "[a]n interim bargaining order would materially alter that status, creating by judicial fiat a relationship that has never existed." *Id.* at 1194. (emphasis added). Although respondent

emphasizes this holding, the Fifth Circuit's decision in *Pilot Freight* is distinguishable. The union in that case was a new, non-incumbent union seeking an initial remedial bargaining order under *NLRB v. Gissel Packing Company,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).[30] The union had tried to obtain signed signature cards from previously unrepresented Florida workers but was met with resistance and coercive tactics from the employer. *Pilot Freight,* 515 F.2d at 1189. Because the union did not have an established bargaining relationship, the *Pilot Freight* court had reason to be hesitant about preserving a "status quo" that did not yet exist. By contrast, the Union in this case had a pre-established bargaining relationship with each of the three MMCI plants before the July and September 1991 acquisitions, and reasonable cause exists to believe that Moeller Rubber is a successor employer to at least one of these plants. The Board here does not seek a *Gissel*-type bargaining order, but merely seeks to ensure that workers at the rubber facility have the bargaining rights they previously enjoyed. *Pilot Freight* noted that "courts have not hesitated to issue interim bargaining orders where a pre-established bargaining re-

**25.** *See Pilot Freight,* 515 F.2d at 1194 ("we are not convinced that a continuation of the non-bargaining status will so deleteriously affect the union that it cannot recover").

**26.** *See Eisenberg v. Hartz Mountain Corporation,* 519 F.2d 138, 141 (3rd Cir.1975) (provision allowing interim relief was intended to assist the Board acting in the public interest and not in the vindication of purely private rights) (citation omitted).

**27.** *Angle v. Sacks,* 382 F.2d 655, 660 (10th Cir. 1967) (purposes of Act could be defeated if temporary relief were not granted under Section 10(j)).

**28.** *See Kaynard v. MMIC, Inc.,* 734 F.2d 950, 952–54 (2nd Cir.1984) (where employer fired employee who was trying to organize union and verbally threatened others, court found that employer had engaged in such egregious and unfair labor practices as to make a fair election virtually impossible); *Minnesota Mining & Manufacturing Co. v. Meter,* 385 F.2d 265, 270 (8th Cir.1967) (reserving relief to "serious and extraordinary" circumstances).

**29.** *Pilot Freight,* 515 F.2d at 1192 (where the Board waited three months before petitioning

the district court for temporary injunctive relief and it was doubtful that an order of reinstatement would be any more effective than a final Board order, district court's refusal to order reinstatement of two employees arguably engaged in union activity was not an abuse of discretion); *Angle,* 382 F.2d at 661 (the more time elapsing between events, the less effective the injunctive relief).

**30.** In *Gissel,* the Supreme Court approved a Board order requiring collective bargaining where the employer's unfair labor practices threatened to undermine a fair representative election. As the Fifth Circuit has noted, "A *Gissel* bargaining order is typically invoked when a union that has only informal evidence of majority status is refused recognition; the order issues because a formal election either fails or is likely to fail because of the company's commission of unfair labor practices." *Air Express International,* 659 F.2d at 614. By contrast, non-*Gissel* bargaining orders are appropriate where recognition has been "withdrawn from a union that has been formally certified as the representative of a bargaining unit." *Id.*

lationship is being eroded ...." *Id.* at 1194 (citing *Davis v. Servis Equipment Company*, 341 F.Supp. 1298 (N.D.Tex.1972) and *Lebus v. Manning, Maxwell & Moore, Inc.*, 218 F.Supp. 702 (W.D.La.1963)).[31]

While the other factors that courts have used in determining equitable necessity have produced a "muddled" body of case law with somewhat inconsistent results,[32] it seems that three of the commonly used factors—the possibility of irreparable harm to the union, concern for the public interest and concern for the statutory policy—seek an answer to the same general question. That is, which party stands to be affected most severely by the court's action or inaction?[33] The court is of the opinion that Moeller Rubber employees, the Union and the public interest will best be served by the granting of some form of interim relief.

Evidence was presented by petitioner to suggest that former rubber plant employees who were previously members of the Union are no longer attending Union meetings and that the employees' concern for their jobs has jeopardized Union support. Thus, the drifting away of employee support during this transition period is a major concern. The one termination decision faced by Moeller Rubber since the September acquisition of assets appears to have been favorably resolved, but it is unclear what effect the absence of the Union will mean for employees facing termination in the future. While bargaining is or has taken place for employees at the other two plants, employees at Moeller Rubber have had little choice but to accept the terms of their new employer.[34] For all of these rea-

**31.** The court cannot agree with respondent that a return to the status quo would mean a return to unilateral decisionmaking on the part of management at Moeller Rubber. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 46–52, 107 S.Ct. 2225, 2237–42, 96 L.Ed.2d 22 (1987), cited by the respondent, does not support this argument. Although *Fall River Dyeing* did discuss the question of when a successor's obligation to bargain arises, that case came before the Supreme Court after a federal court of appeals had issued a decree enforcing a National Labor Relations Board decision which had found an unfair labor practice in a successor employer's refusal to bargain. Thus, no request for interim relief was involved in that case.

More importantly, the case, which affirmed the court of appeals decision, in no way stands for the proposition that the new employer has the unfettered right to establish its own terms of employment. Instead, the Supreme Court held that a successor's obligation to bargain could exist even where the union in question was not recently certified. *Id.* at 36–41, 107 S.Ct. at 2232–35. Far from supporting respondent's position, *Fall River Dyeing* explains why employees who find themselves in a new enterprise will find it helpful to look to their former chosen representative and why that chosen representative enjoys a presumption of majority support:
> [A]fter being hired by a new company following a layoff from the old, employees initially will be concerned primarily with maintaining their new jobs. In fact, they might be inclined to shun support for their former union, especially if they believe that such support will jeopardize their jobs with the successor ...

*Id.* at 40, 107 S.Ct. at 2234.

**32.** Note of the muddled case law on the just and proper standard was recognized by the Fifth

Circuit in *Pilot Freight, (Teamsters)* 479 F.2d at 787, and by at least one writer in Note, *Section 10(j) of the National Labor Relations Act: A Legislative, Administrative and Judicial Look at a Potentially Effective (But Seldom) Used Remedy*, 18 Santa Clara L.Rev. 1021, 1044–50 (1978).

**33.** As the Fifth Circuit noted in *Boire II:*
> No matter how this court decides the issue, one of the parties stands to be hurt. If [the employer is] required to bargain with the [union], our order might be highly prejudicial to the employer's interests ... Similarly, if we fail to require bargaining ... the union may have lost several months of representational services it could have performed. *Id.* at 1194.

**34.** It may be true that "the results of good-faith bargaining are not necessarily beneficial to employees," *see* Respondent's Reply Memorandum in Opposition to Petition for Temporary Injunction, p. 14, but this is not a determination for the employer to make; the freedom to choose continued representation is a benefit in and of itself, one that fosters the public interest and the statutory policy of industrial peace. While a bargaining order will undoubtedly burden this new employer, it will not compel any particular term or condition of employment or create increased wages and benefits. Instead, any order granted by the court can only require that Moeller Rubber Products meet with the Union and bargain in good faith. *See* Section 8(d) of the National Labor Relations Act (129 U.S.C. § 158(d) (the obligation to bargain "does not compel either party to agree to a proposal or require the making of a concession"); *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970) (even the Board has no authority to order a respondent to agree to a particular bargaining proposal).

sons, the court finds that more harm will be created by the absence of injunctive relief than by its temporary presence.

Turning to the final factors mentioned above, the flagrancy of the violation and the timeliness of the request, the court finds that injunctive relief is appropriate even while agreeing that the respondent's behavior has not been extremely blatant. While Moeller Rubber has adamantly refused to bargain, petitioner produced no evidence of verbal threats or discriminatory practices. Even so, the court finds that the equities in this case weigh in favor of an interim bargaining order. Not issuing an injunction would have the effect of allowing bargaining in two of the sister facilities of the former MMCI, while prohibiting it in the third facility when reasonable cause exists to suggest that Moeller Rubber is a successor to the previous employer. With so many previously employed MMCI workers who were also members of the Union, strong argument exists to support the current representative status of the Union. Nor is the court persuaded by respondent's arguments that Board-caused delays have diminished the need for an injunction. The refusal to bargain occurred on October 8, 1991. The instant petition for injunctive relief was filed three and a half months later on January 21, 1992. In the interim, the Regional Director investigated the unfair labor practice charge, issued a complaint to the charging party and received respondent's answer on December 13, 1991. Thereafter, the Regional Director immediately sought authorization to seek injunctive relief which, according to petitioner, was granted on January 16, 1992. The petition for injunctive relief was filed in this court less than a week later. In the opinion of the court, the Board acted as quickly as reasonably possible.[35]

Having determined that some form of relief is necessary, the court nevertheless finds that only part of the relief petitioner seeks is just and proper. As noted in the facts of this opinion, petitioner's request for relief has two basic parts with several subparts. First, petitioner seeks a temporary injunctive order requiring the respondent to cease and desist from refusing to recognize, meet with and bargain in good faith with the union. The first request goes on to state that the respondent should be prevented from "in any other manner failing or refusing to bargain in good faith with the Union" and "in any other matter interfering with, restraining or coercing its employees."[36] Because an injunction is an extraordinary remedy and must be narrowly tailored to the need, *Pilot Freight*, 515 F.2d at 1192, the court finds that a temporary injunctive order preventing respondent's further refusal to bargain will more than suffice to satisfy these concerns. Second, petitioner seeks an affirmative order requiring interim bargaining pending the Board's decision. As part of this second request, petitioner seeks to have the opinion and order of this court posted at respondent's plant and asks that the respondent be compelled to file an affidavit specifying how it has complied with the court's decision. While interim bargaining is necessary to preserve the status quo, the latter part of the request reaches too far. Requiring the respondent to post the court's opinion and order and file an affidavit of compliance is not equitably necessary when respondent has shown a willingness to respect the pending Board dispute and has refrained from flagrant, discriminatory tactics. The record convinces this court that respondent will bargain in good faith if ordered to do so. If this should not be

---

**35.** In *Pilot Freight,* the Board's three-month delay in petitioning the district court was one reason why the appellate court affirmed the district court's decision not to order reinstatement of two employees. *Pilot Freight,* 515 F.2d at 1193. Although respondent cites this case in support of a diminished need for an interim order, numerous other factors guided the court's decision, including the previously discussed concern about creating a status quo that did not yet exist. In interpreting the *Pilot*

*Freight* decision, another court of appeals stated that delay may be considered as a factor only when it is "of such a character that a final Board order is as likely to be as effective as an interlocutory court order." *Solien v. Merchants Home Delivery Service, Inc.,* 557 F.2d 622, 627 (8th Cir.1977).

**36.** Petitioner's Memorandum in Support of Petition for Temporary Injunction, p. 32.

the case, petitioner may petition the court for additional relief when and if such relief becomes appropriate.

A separate order in accordance with this memorandum opinion will be entered this day.